IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

WESTERN HOLDING GROUP, INC.;
MARINE EXPRESS, INC. and
CORPORACIÓN FERRIES DEL
CARIBE, INC.,

Plaintiffs

v.

THE MAYAGÜEZ PORT COMMISSION,
et al.,

Defendants

CIVIL 08-2335 (ADC)

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
## ON MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs, allegedly common carriers within the meaning of the Shipping Act of 1984,  bring this complaint against the defendants, who are allegedly marine terminal operators, for violations of the Shipping Act of 1984, 46 U.S.C. § 41102(c), violations which include unreasonable tariffs, their unjust, unreasonable and unlawful practices, (Docket No. 1, at 27, ¶ 89), unreasonable refusals to negotiate, and unreasonable discrimination, thus causing undue or unreasonable prejudice or disadvantages to plaintiffs in violation of 46 U.S.C. § 41106 (1)-(3). Plaintiffs also allege violation of their Constitutional rights under  the Foreign Commerce Clause, the Import-Export Clause, the Tonnage Clause, the right to travel under the Fifth Amendment Due Process Clause, the Taking Clause, the Substantive Due Process and Equal Protection Clauses.

CIVIL 08-2335 (ADC)                    2

This matter is before the court on Motion for Preliminary Injunction filed by plaintiffs Western Holding Group, Inc., Marine Express, Inc. and Corporación Ferries del Caribe, Inc., on November 25, 2008 (Docket No. 2) against defendants Mayagüez Port Commission and its members, Commissioners Dennis Bechara, Alfredo Archilla, Sergio Zeligman, Enrique Gómez and William Phiths, in their official capacity, and Holland Group Port Investment (Mayagüez), Inc., José González Freyre, and Antonio Jacobs, as administrators of the port of Mayagüez. For purposes of the preliminary injunction issue, plaintiffs are foregoing the constitution-based attacks on the defendants' actions.

The parties are engaged in varying disputes before the Federal Maritime Commission, before this court, and before the defendant Mayagüez Port Commission.   Plaintiffs are arguably common carriers and owners of the M/V Caribbean Express, a vessel which operates out of the port of Mayagüez.  Plaintiffs operate a ferry service which transports goods and passengers to and from the Dominican Republic, something they have done for the last 15 years.  The vessel has a capacity for 1,067 passengers, forty 45-feet containers, and fifty motor vehicles.  Due to her particular design, the M/V Caribbean Express can apparently dock only at the port of Mayagüez of all the ports in Puerto Rico.  The defendants are the owners and operators of the port of Mayagüez.

On November 14, 2008, the defendants were served with a copy of a verified complaint filed by plaintiffs with the Federal Maritime Commission

CIVIL 08-2335 (ADC)                    3

requesting redress and damages under the Shipping Act.  (Docket No. 1, at 23, ¶ 78); Fed. Reg. Vol. 73, No. 233, at 73655.  The Federal Maritime Commission is the primary forum for resolving disputes between marine terminal operators and common carriers.  In the matter before the Federal Maritime Commission, plaintiffs argue that the defendants have failed to honor the terms of Marine Express' existing lease, and further contend that their actions constitute violations of the Shipping Act, including unjust, unreasonable and unlawful practices in violation of 46 U.S.C. § 41102(c), and unreasonable refusals to negotiate, unreasonable discrimination and undue or unreasonable prejudice and disadvantages in violation of 46 U.S.C. § 41106(1)-(3).  Plaintiffs ask the Federal Maritime Commission to order these defendants to cease and desist from violations of the Shipping Act, that it put in force such practices as the Federal Maritime Commission determines lawful and reasonable and pay plaintiffs reparations of $25,000,000.

Plaintiffs argue before this court that the defendants' predatory practices have the intention of driving them out of business while having a negative effect on an economically depressed area.  The president of Holland Group is also charged with attempting to extortionately extract $600,000 from plaintiffs payable in any manner.  Plaintiffs allege that the defendants have locked them out of the cargo operations area, have cancelled the terminal lease contract, have refused to negotiate, have arbitrarily and unreasonably imposed wharfage, demurrage and

CIVIL 08-2335 (ADC)                           4

other penalties, have overcharged docking, and have increased the rent by 833%, all in violation of the Shipping Act of 1984.   (Docket No. 2, at 3.)   Plaintiffs conclude that the defendants' stated objective is to prohibit plaintiffs' vessel from docking at the port of Mayagüez.   The defendants on the other hand riposte that plaintiffs have been subsidized by a previously non-profit port operation lacking in fiscal reality and that Holland Group has been willing to negotiate the terms of the new lease agreement but that plaintiffs are entrenched in keeping the old rate, a rate which does not reflect the realities of the expenses of the port.   The defendants rely on the recently published tariff governing port operations, and the fact that there is no current valid lease with the plaintiffs.

The focus of the preliminary injunction request and indeed the complaint is to temporarily enjoin the defendants from actions that violate the Shipping Act while the Federal Maritime Commission adjudicates the complaint filed there.   This is so because the Shipping Act does not grant the Federal Maritime Commission the authority to issue a preliminary injunction during the pendency of the proceedings before it.   To the contrary, the district court is granted such jurisdiction to maintain the status quo while the administrative proceedings are concluded.   See 46 U.S.C. § 41306.

At the hearings held on January 16, 20, 26, and February 6, 2009, plaintiffs were represented by Jorge Blasini and J. Ramón Rivera Morales, Esqs., appearing defendants Holland Group Port Investment (Mayagüez), Inc., José González

CIVIL 08-2335 (ADC)                    5

Freyre, and Antonio Jacobs, as administrators of the port of Mayagüez by attorneys José Cancio Bigas and Charles Vilaro Valderrábano; attorney Ivonne M. Menéndez Calero, representing the port of Mayagüez, announced a stipulation in relation to the motion for preliminary injunction and other matters, which stipulation was approved on the morning of January 16, 2009. (Docket No. 52.) Comprehensive and thoughtful post-hearing memoranda have been filed by plaintiffs (Docket No. 73, dated February 23, 2009) and participating defendants (Docket No. 76, dated February 25, 2009).

### TESTIMONY OF MARIBEL MÁS

Maribel Más Rivera testified that she lives in Mayagüez, has a bachelor's degree in accounting, has been a licensed C.P.A. since 1993, and holds a J.D. She is the vice-president of the three plaintiff corporations, Marine Express, Inc., Corporación Ferries del Caribe, Inc., and Western Holding Group, Inc. Sixteen years ago, she was part of the group that started Marine Express, which is dedicated to the transport of maritime container cargo between Santo Domingo and Puerto Rico. Corporación Ferries del Caribe began in 1998, and was dedicated to the transportation of passengers and cargo between Santo Domingo and Mayagüez. Western Holding Group owns and charters a ship, the M/V Caribbean Express. It has rented the ship in this case to Marine Express and Ferries del Caribe since 2004. The purchase price for the vessel was $12,800,000. Before Ferries del Caribe started, Marine Express exclusively rented

CIVIL 08-2335 (ADC)                    6

out RORO (roll-on/roll-off) cargo ships, where the containers could go on and off of the ship using trucks.  Thus, the containers could  leave the ship on their own wheels.  Cranes are not required for loading and unloading.  The ship itself is a combined type cruise vessel, a hybrid, containing nine floors, five of which are dedicated to passengers.  The vessel has all the facilities of a cruise ship.  It has 365 cabins or rooms, two restaurants, children and infant playroom areas, duty free shops, a beauty salon, spa, jewelry show, nightclub, orchestra, and a show every night.  In short, the vessel has everything a cruise ship has.  The rest of the floors of the Caribbean Express contain cargo and passenger cars.  While the operation began in 1998, the Caribbean Express began in 2003, under a charter agreement.  The vessel was in Europe when chartered and arrived here via its own propulsion.  Displacement of the vessel in gross tonnage is 19,292 tons.  The ship is 525 feet long, and has a crew of 175, including deck and engine personnel.  It has a capacity of 1,067 passengers, as well as 80 cargo containers 20 feet long, referred to as TEU's[1], and 50 vehicles.  At the closing of the last fiscal year, the Caribbean Express had transported 169,002 passengers, as well as approximately 22,500 TEU's, and 18,800 vehicles.  The ports of operation are Mayagüez and Santo Domingo, close to San Souci.  The travel distance between

---

[1]TEU stands for twenty-foot equivalent unit, a term of cargo capacity.

CIVIL 08-2335 (ADC)                    7

Santo Domingo and Mayagüez is approximately 160 nautical miles.   The
Caribbean Express is a Panamanian flag vessel.

Ms. Más has responsibilities in the three corporations, including their
establishments, everything related to fiscal and accounting issues, some legal
matters, matter related to internal controls and procedures, and human resources
issues.  Six managers report to her.  She handles issues dealing with invoices and
accounts.  In some matters, accounting is performed by Ferries del Caribe, and
in others by Marine Express.  Making reference to Exhibit 44 (Worldwide Foreign
Tariff), Ms. Más noted that this includes the tariffs applicable to Marine Express,
tariffs which are published before the Federal Maritime Commission by the
Effective Tariff Management Corporation.   At page 1, referring to Worldwide
Foreign Tariff, the first line shows Marine Express to be a common carrier before
the Federal Maritime Commission, number 0111247.  The tariff is where prices are
published with different rates for different movements or commodities so that the
general public knows what Marine Express' rates are if they are interested in their
service.

Ms. Más referred to  Exhibit 45, a bill of lading used by Marine Express for
transportation, and noted that it contains the contract on the back part (adverse),
something required by common carriers when they ship goods for their clients.
Those clients can acquire the bills of lading and prepare them, or the clients ask
Marine Express to prepare them, which it does.  In general, the bills of lading are

CIVIL 08-2335 (ADC)                    8

used by the public at large who want the product.  At the front lower left hand side of the bill of lading, it notes that this document is attached to the carrier's tariffs published with the Federal Maritime Commission.  The bill of lading has to be presented to the Federal Maritime Commission for its approval.  This particular bill of lading has been used since Marine Express began operations in 1993.  The port of loading portion reflects where the container  is loaded on the vessel, which could be Santo Domingo or Mayagüez.

Ms. Más referred to Exhibit 46, a passenger ticket containing the contract of transport.  Agencies that sell the ticket or company personnel prepare the ticket.  These are offered to the public in general which wishes to use their product.  Exhibit 47 is an electronic confirmation from the Federal Maritime Commission, FORM FMC-1, confirming that Marine Express, Inc., is a VOCC (vessel operator common carrier), and is marked on the list as vessel operator common carrier.  A person cannot board the vessel without a passenger ticket, nor can a container get on board the vessel without a bill of lading.

Making reference to the facilities at the port of Mayagüez, Ms. Más noted that prior to 2003, they had a lease for the buildings the company uses with the Puerto Rico Ports Authority, and the tariff applied to that contract with the Puerto Rico Ports Authority.  In January 2003, they renewed the lease contract for an additional five years.  The area under that lease was 129,000 square feet, including areas for offices, a workhouse, warehouse, and, among others, a

CIVIL 08-2335 (ADC)                    9

preferential land area of about 2 cuerdas.[2]  The preferential area is a designated

zone assigned by the Puerto Rico Ports Authority so the common carrier or

maritime agent can accommodate containers for unlimited time without paying an

additional charge.[3]  The cost for rental for the preferential area is therefore higher

than any other part of the port area.

Referring to Exhibit 1, a contract with the Puerto Rico Ports Authority, Ms.

Más noted that she signed it in January 2003, representing Marine Express, Inc.

Article 1 of the contract makes reference to a land area close to 129,000 square

feet.  Referring to Exhibit 43, a blueprint of the port of Mayagüez, Ms. Más noted

that the yellow highlighter marked the areas leased in 2003 with Puerto Rico Ports

Authority.  At the lower left of Exhibit 43 is reflected where the ship docks.  A part

of the port near Gate 4 is rented, as is a section for passenger buses to the right

of the middle of the blueprint.  There is an area with three offices which they have

now, plus 2.9 cuerdas (preferential area) at the upper left of the blueprint, near

gate 5.  There is a smaller area which is also a preferential area.  There are no

demurrage charges nor additional charges forthcoming as a result of the use of

the preferential area.  A demurrage charge is leveled against the common carrier

[2]A cuerda is a unit of land measure which is slightly less than an acre, roughly 96.5%.

[3]Exhibit B shows the large preferential area as the largest area circled in blue marker.

CIVIL 08-2335 (ADC)                    10

when it exceeds the free time.  If one does not have a preferential area, then one is charged with demurrage.

Ms. Más stated that the monthly rent in 2003 was $7,900 plus $600 for water and electrical power, for a total of $8,611, under Exhibit 1, the existing tariff, which is in M-1-5, the Puerto Rico Ports Authority tariff, the tariff applicable to all of the ports of Puerto Rico.  Exhibit 2 contains the published tariff or rates of the Puerto Rico Ports Authority beginning in January 2004 (through December 31, 2008), Tariff M-1-6, which rate is applicable to the lease agreement at the port of Mayagüez.

Ms. Más explained that in August 2004, the Municipality of Mayagüez created the Mayagüez Port Commission for the purpose of administering and managing the port.  The rent continued under the same terms of the original contract with the Puerto Rico Ports Authority.  Plaintiffs paid approximately $9,118 a month, and in August, 2004, they paid the rent to the Mayagüez Port Commission rather than to the Puerto Rico Ports Authority.  Referring to Exhibit 3, Ms. Más noted it is a letter dated August 18, 2004 from the Mayagüez Port Commission to her firm, notifying that the port was transferred, and all rents were to be paid to the Mayagüez Port Commission.  Seventeen  months later, in January 2006, the  Mayagüez  Port Commission  said they will no longer consider valid the contract in force, although the rent payment was the same previously

CIVIL 08-2335 (ADC)                    11

maintained under the M-1-6 tariff.[4]  The Mayagüez Port Commission let plaintiffs

know they terminated plaintiffs' contract although it was valid until January 2008.

They said that if plaintiffs were not in agreement, they had 15 days to leave the

premises.  Plaintiffs' response was to oppose the Port of Mayagüez' decision, and

to note that the contract  was in force until January 2008.  (See Exhibit 5, letter

dated February 13, 2006.)

Referring to Exhibit 6, a letter dated March 22, 2007, Ms. Más noted it was

a letter to the Mayagüez Port Commission.  Since more than a year had passed

since the previous stated communication, plaintiffs proceeded to spell out their

needs.  No tariff had yet been published by the Mayagüez Port Commission, and

plaintiffs told them of their needs and suggested that the tariffs of the Puerto Rico

Ports Authority be retained.  Plaintiffs asked to sign a new contract because their

contract would expires in 10 months. Plaintiffs asked for a 15-year contract.

Marine Express has been there 16 years and the structure that has been created

with the three corporations, Marine Express, Ferries del Caribe, and Western

Holding Group, Inc., required a long term contract in order to give continuity to

the business because of the cost involved.  The Mayagüez Port Commission did

not respond to this request.  Exhibit 7 is the draft of a contract sent to plaintiffs

by the Mayagüez Port Commission on April 18, 2007.   The draft was not

_____

[4]See Exhibit 4.

CIVIL 08-2335 (ADC)                    12

negotiated and plaintiffs were not able to accept it.  This contact would place plaintiffs out of the Port of Mayagüez.  The Mayagüez Port Commission  offered 3,000 square feet to handle all of plaintiffs' operation, cargo and passengers.  It allowed for 1,600 square feet for operations and 1,400 square feet for office space.  In two cuerdas, they could place a bit more than 20 containers.  In 1,600 square feet, they could park about 4 containers.  The rent payment under the draft contract reflected about 1,000% rent increase.  If the rate were pro-rated, the rent payment would be over $1,000,000, this for the only carrier at the terminal.

Ms. Más sent a letter, Exhibit 8, dated May 8, 2007, to the Mayagüez Port Commission, opposing the proposal because they were taking plaintiffs out of the port of Mayagüez.  The letter asked them to consider that plaintiffs were the only company operating there for the last 14 ½ years, and had direct employment of more than 600 individuals.

In May 2007, Holland Group signed a contract with Mayagüez Port Commission to manage  the port of Mayagüez.  Exhibit  9, a letter dated May 25, 2007, is signed by José González Freyre, president of Holland Group.  It lets plaintiffs know that on May 11, 2007, they had signed an agreement for Holland Group to manage and operate the port, and they were in the takeover phase.  The letter said to notify them of any requirements plaintiffs had by July 15, 2007.  Ms. Más learned of this agreement through the press on May 11, 2007.  On

CIVIL 08-2335 (ADC)                    13

May 30, 2007, Néstor González, plaintiffs' president, wrote José González Freyre of Holland Group, responding to the May 25 letter, welcoming Holland Group and detailing plaintiffs' general necessities in the port of Mayagüez.  See Exhibit 10.

Exhibit 11 is a letter from Holland Group which threatens plaintiffs in that plaintiffs' ship will not be permitted to dock, and notes information that there was leakage from the fuel tank used to load plaintiffs' trucks.  Ms. Más denied this. There was no leak of fuel tanks.  She explained that a forklift of plaintiffs' operations had one of its hydraulic lines fall on the surface and there was spillage.

Ms. Más noted that the ground operation is complex and complete.  Plaintiffs have 2,000 pieces of equipment.  The Caribbean Express makes three to four round trip voyages per week, continuously, dispatching and receiving containers. Furthermore, there is  loose cargo which is managed with forklift, and transferred to platforms.  They also have special tractors used to move the containers into and out of the vessel.  The workshop area is used to continuously verify the containers to assure that they comply with the rules of Puerto Rico public roads and Santo Domingo roads.  If those rules are not complied with, plaintiffs will receive a number of fines and this would not allow them to be able to put their equipment to work.  Santo Domingo's regulations are quite different and there is a category of people there that, due to their necessities, pull out lights and cable work from the containers (vandalize) and plaintiffs have to guarantee and verify the equipment within the port.  Clients have a considerable volume of equipment.

CIVIL 08-2335 (ADC)                    14

There are 200 clients between Mayagüez and Santo Domingo.  Each client has 6, 8 to 12 units.  In the port of Santo Domingo, in Mayagüguez, and other places, there are more than 2,000 units available.  If the equipment is not being used, it would be stored in the preferential area, as well as loose cargo, and cargo on pallets, which, if the pallets are broken, have to be changed to other pallets.  That is done with a forklift, and the trash has to be disposed of.

Ms. Más referred to Exhibit 12, a letter dated June 6, 2007 from Holland Group and its president José González Freyre.  It is a follow-up to the  May 30, 2007 letter where plaintiffs told them of their necessities.  In the last paragraph, Holland Group asks plaintiffs to again give them their needs and requirements in the port of Mayagüez.  Ms. Más did not know why Mr. González requested this.

Exhibit 13, letter dated June 8, 2007, states that between June and August 2007, the parties could not negotiate.  Ms. Más disagrees with this assessment.  Rather, there was a 90-day period from the date of signature where Holland Group could not sign contracts with plaintiffs.  The letter of June 8 from the Mayagüez Port Commission said that plaintiffs have to negotiate with Holland Group.  Thus Ms. Más noted that there is a limbo which lasts two months since plaintiffs could not contract with either Holland Group or the Mayagüez Port Commission.  In August 2007, Holland Group  took possession of the port, but Ms. Más did not meet with Holland Group.  Rather, there was a general cocktail party with Holland Group people and plaintiffs spent time with them at the cocktail

CIVIL 08-2335 (ADC)                    15

party but no contract was discussed.  The cocktail party was Holland Group's celebration for their taking control of the port.  Exhibit 14, dated August 10,2007, the date after the cocktail party, is a letter to José González Freyre, president of Holland Group, from Néstor González, plaintiffs' president, referring to a conversation of August 9, where José González Freyre had said to write down plaintiffs' needs.  Thus, Exhibit 14 details the areas where plaintiffs are needing, and the area size they are needing, including a map so that he could see the area which plaintiffs  were referring to.  Plaintiffs needed only 11.5% of the total area of the port facility.  There were no other users of the ports facilities.

In January 2008, the Puerto Rico Ports Authority  contract expired or lapsed and the rent was maintained the same.  Plaintiffs thus paid the same rent.  In March 13, 2008, Holland Group had plaintiffs receive the tariff rates related to the docking of vessels, effective in 48 hours after delivery time of same.  Ms. Más did not review them.  There had been hearings in the summer of 2007, as required by law when a tariff is going to be drafted.  Plaintiffs asked for a copy and evaluated it.  The increases were unreasonable and unjustified, as to some of the items.  They were high.

Ms. Más made reference to Exhibit 42 which reflects a series of rent invoices, and copies of plaintiffs' payments.  The first rent invoice is for $9,118.82 a month, an invoice which she paid.  Invoice 0158 is for the month of March 2008. For April, 2008, the invoice is for the amount of $9,118.82; for May, the amount

CIVIL 08-2335 (ADC)                    16

of the invoice is $9,118.82, and for June, July, and August, it is the same: $9,118.82.  The September invoice, number 0330, is for $9,118.82.  That amount was paid.  Invoice 0337, dated September 9, 2008 was for $57,478.91, applying the first payment of September as credit.  The payment would be approximately $66,600 if no credit were given.  There was no previous notification of this increase, and the same was not negotiated.

Exhibit 16, dated September 9, 2008, is from Holland Group to Maribel Más, in which Holland Group states for the first time the rent payments for the Mayagüez port facilities and the costs of utilities.  The annual rent became close to $800,000, where $106,000 had been the annual entry.  For the first time plaintiffs are informed of these payments, payments which were not negotiated. No tariffs concerning rental were provided to Maribel Más.

For comparative purposes, Ms. Más referred to Exhibit 41, a rental agreement between Puerto Rico Ports Authority and Crowley Liner Services, Inc. At article 1, page 2, the total area rented is  81.1153 cuerdas.  Article 2, page 3 shows the term of the lease agreement is 10 years with 2 options of 5 years at Crowley's option or discretion.  At article 5, page 8, the rental for the Terminal in Isla Grande is $165,297.01 monthly for 81.11 cuerdas while Exhibit 16 is $66,597.73 for close to 3 cuerdas.  In 2007, plaintiffs paid out $106,000 for utilities including electrical power and water.  The increase is about $700,000 or an 833% increase, without utilities.  Ms. Más found this totally unreasonable,

CIVIL 08-2335 (ADC)                    17

unjustified and the effect would be that they would be the only shipping company in Puerto Rico paying these rates.   Ms. Más referred to Exhibit 17, dated September 10, 2008, a notification to the Mayagüez Port Commission informing them about Holland Group's increase in rent, close to an additional $704,000, excluding utilities and asking them to intervene.   The Mayagüez Port Commission did not respond to this letter.   Exhibit 18 is plaintiffs' letter to Holland Group stating that they were not in agreement with the rent of $66,000, telling Holland Group that they were agreeable to sit down and negotiate, and telling them about the Puerto Rico Ports Authority rents paid in Puerto Rico.   Exhibit 20, a letter to Holland Group dated September 30, 2008, notifies it of plaintiffs' opposition to the rental invoice for the month of October.   Holland Group responded on October 1 (Exhibit 21) and notified plaintiffs to empty the premises of the workshop and offices and that they would be shutting down the air conditioning system at the terminal and all non-essential services of loading and unloading the vessels and they would be telling United States Customs to leave the port premises.   (This would close the operation.)   The letter is signed by Tony Jacobs, port director of the Holland Group, and is sent to Maribel Más.   Ms. Más noted that if the air conditioning is turned off, it is uncomfortable for the passengers, personnel and United States Customs because they could not work, and the computers are at risk because of the temperature of the computers.   If there is no customs service, the vessels could not be received.

CIVIL 08-2335 (ADC)                        18

Plaintiffs did not reply to this letter in writing.  Rather, they called members of the Mayagüez Port Commission who then coordinated a meeting with Holland Group and plaintiffs on October 2, 2008.  Present at that meeting representing the Mayagüez Port Commission was attorney José Sánchez, Holland Group, represented by José González Freyre, its president, and Sarimila Méndez, and plaintiffs, represented by attorney Antonio Rodríguez from Fiddler & González, Carlos Bayron, Néstor González, president of Marine Express, and Ms. Más. Antonio Jacobs was not there.  The meeting began with José González Freyre looking at plaintiffs' president, saying "The message is clear.  I need $600,000 from you.  How you're going to pay, it doesn't matter."  Néstor González told José González Freyre that the rental for the areas was unreasonable, and asked him why this is necessary, and José González Freyre said "due to services."  Néstor González then said that nothing has been done any differently than during the last 16 years, and José González Freyre repeated "Services. Services," with no explanation.  The meeting lasted two hour.

Considering the demand for the additional $600,000 while not providing any additional services at all, Ms. Más felt uncomfortable and extorted.  Trying to reach a negotiation and a conclusion, plaintiffs told José González Freyre that while Holland Group had been at the port 14 months or so, plaintiffs would be disposed to include in the port tariff a $1.50 per passenger fee, which would have amounted to $255,000 per year.  Adding this to the tariff increase of January 1,

CIVIL 08-2335 (ADC)                    19

2009, they would increase income to $416,000.  José González Freyre said that

he would  set up a table close to United States Customs and charge the customer

a Customs Access Fee of $3.00 per passenger, prior to their getting on the ship.

Plaintiffs' attorney Carlos Bayron, the Mayagüez Port  Commission attorney José

Sánchez, and Ms. Más decided that this could not be done and that the tariff

would have to be amended to establish this additional fee.  José González Freyre

did not agree.  It was agreed that plaintiffs' attorney, Carlos Bayron, would send

plaintiffs' proposal to the attorney for the Mayagüez Port Commission.   José

González Freyre said that since there is no agreement, as of the previous day,

Holland Group would be invoicing on a daily basis in accordance with a clause

allowing for appropriate tariff rates.

On October 3, 2008, plaintiffs started receiving daily invoices, the first for

about $6,000 per day, reflecting a fee for equipment at the port.  The invoice did

not include an inventory of dates of entry, and did not have supporting

documentation.  (See Exhibit 30, invoice 0357 refer to the tariff 16.6.3.1 in its

second item, and for the amount of $6,083.28.)  Referring to Exhibit 15, page

114, use of crane and specialized equipment, Ms. Más noted that plaintiffs have

RORO, and do not have cranes.  She also noted that vessel owners will be held

responsible for violating any of the Port of Mayagüez' resolution.  Before this,

plaintiffs had never been charged for this rate.  Item 60.7.2.1 of invoice 0357, is

for demurrage in excess of the free time.  Five days is the general rule for free

CIVIL 08-2335 (ADC)                          20

time in the tariff, but for cargo coming from overseas, the free time is six days since it has to go through Customs.  If plaintiffs pay preferential area rental, the purpose is not to pay demurrage.  Ms. Más did not know why Holland Group was charging demurrage since it was not applicable.  Similar charges are reflected in other invoices contained in Exhibit 30.  Maribel Más wrote Holland Group and said that they disagreed with the invoices and why they disagreed, but also because there were no supporting documents.  Plaintiffs did not know what equipment was being referred to.

Plaintiffs made a formal complaint before the Mayagüez Port Commission for the illegal rate.  Previously, they had never complained.  Plaintiffs had had  a preferential area and their conclusion was that Holland Group had taken away their preferential area.  The check for October's rent was returned to plaintiffs.

Ms. Más referred to Exhibit 22, a letter dated October 8, 2008 from plaintiffs' attorney Carlos Bayron which he had promised to send to attorney Sánchez of the Mayagüez Port Commission, with plaintiffs' proposal to reach an agreement with Holland Group so they could have additional income and leave the rent as it was, competitive with the ports of Puerto Rico.  Exhibit 23 is a letter dated October 10, 2008, which plaintiffs sent Holland Group stating that they were not in agreement with the invoices and stating the reason why, that there was a lack of inventory and improper assessment of tariffs.  Ms. Más referred to Exhibit 25, a letter dated October 20 2008, from her to Holland Group's Antonio Jacobs,

CIVIL 08-2335 (ADC)                    21

which is a follow-up letter related to the issue of the invoices that had continued coming and which she felt are an improper application of the tariff list.

Ms. Más testified that Thursday, October 23, 2008 was "grave" for plaintiffs' operation.  At about 9:30 A.M., Gate 5, which provides access to the operations area, was closed, and no vehicle was allowed in or out.  Thus, plaintiffs could not take the equipment in or out.  The marine terminal has five main gates.  Gate 5 is where Marine Express' cargo enters and exits, and it was closed with a lock.  A guard was present with instructions not to allow equipment in or out.

Plaintiffs received complaints from their clients.  Cargo had arrived Wednesday.  While tax and customs releases were acquired, the containers were not permitted to leave the port.  In addition, the containers that were arriving that day had to be received and accommodated on the street  because plaintiffs could not put them inside the operations area, and if they were inside, they were not able to come out.  This gate closure lasted the rest of that day.  There was also cargo of third parties which had nothing to do with the parties.  Marine Express had made arrangements with large companies in Puerto Rico and Santo Domingo which had large expenses in warehousing and because of the voyage frequency, many of these companies  operated their manufacturing cycle in a certain manner and did not have to warehouse products due to plaintiffs' schedule.  Thus, not being able to give them merchandise on the 23rd, this affected their operations also.  Ground transportation firms allowed plaintiffs to place buses and containers

CIVIL 08-2335 (ADC)                    22

in their premises at a cost.   Plaintiffs have four large Greyhound-like, 48-passenger and 60-passenger buses, which provide transportation from the Mayagüez and San Juan metropolitan area.   There was a dedicated area in the port before that, but after October 23, these went to Orlando González' premises, which are a bit far from the port.   Plaintiffs' employees had to retrieve the buses from these areas.   In the port of San Juan, plaintiffs have 2 cuerdas contracted with Puerto Rico Ports Authority, and a small office.   It is located next to Pan-American I, in Isla Grande.   Plaintiffs pay $25,000 per cuerda per year.   This is a preferential area for both and they pay $50,000 a year for five years.   The purpose is to allow Marine Express' clients to drop off or retrieve empty containers there.

Ms. Más noted that Exhibit 26 is a letter dated October 23, 2008 signed by Tony Jacobs to her.   It established that the vessel will not be docking unless the operation of docking the ship is prepaid.   Before October 23, 2008, once the docking permit was requested, which was 2 or 3 weeks in advance, plaintiffs had 24 hours after docking to pay the invoice, except for Friday operations which were paid on Monday.   A docking permit is given by the administrator of the port with the purpose of allowing a ship to enter the port.   The vessel cannot come in if there is no docking permit.   In the port of San Juan, the procedure is that you can turn in the permit request up to one month in advance.   It is not prepaid in San Juan.   Plaintiffs also were to get a 5% discount which was for those common

CIVIL 08-2335 (ADC)                    23

carriers which are excellent payers.  Before this, plaintiffs never had to prepay for

the docking permit.

A second letter dated October 23, 2008, from Tony Jacobs to Marine

Express, notifies them that their credit privileges are revoked.  They were further

notified that there is no negotiation with plaintiffs although they tried to negotiate

terms at the meeting of October  2, and on October 8, plaintiffs sent a proposal

which was never responded to.

Ms. Más referred to Exhibit 30, invoice 438, reflecting a fee of 28.56 for

specialized equipment which had been abandoned.  On October 24, 2008, due to

the Gate 5 closing problem, plaintiffs called the Mayagüez Port Commission and

asked it to intervene because it was unreasonable to operate smoothly during

negotiations.  Sergio Zeligman and Dennis Bechara agreed by telephone to be

with plaintiffs at the port.  Mr. Zeligman and Mr. Bechara went to the port.  They

had talked to Holland Group personnel trying to seek a solution.  The operation

began normally and plaintiffs had to make prepayment or they would not be able

to dock the vessel.  While at the Mayagüez Port Commission, plaintiffs started

getting another set of invoices from Holland Group.  For example,  if a container

had been in port more than six days, plaintiffs had to make a check for every

container to get the container out of the port.  Plaintiffs had to pay these invoices,

or they could not provide the cargo to the clients.  These charges were

demurrage, which is when a client exceeded the free time that is notified through

CIVIL 08-2335 (ADC)                    24

the tariff.  The client has 10 days under their tariff to return the container empty, and he is then charged demurrage.  The normal procedure is net 30 days as terms.  If a client has demurrage previously, plaintiffs do not detain or stop them based on that charge.  Ms. Más noted that there is a regulation which does not allow delaying the cargo.      Ms. Más referred to Exhibit 29,  the complaint against Holland Group before the Mayagüez Port Commission due to conditions at the port where there are risks for the operations.  One part of the pier or dock which is transited through is sloping; the gutters there have holes since there is excess girth of pavement so that the grills cannot be elevated, and thus the surface turns into a hole.  There are no fenders to protect the vessel.  If the vessel goes back, it can receive a serious impact  with the dock or a vessel.

Ms. Más noted that Exhibit 42, invoice 0351, is for rent for October in the amount of $66,597, forwarded by Holland Group.   Invoice 0480, dated October 31, 2008, is for October's rent for another amount.  In other words, there are two invoices for the same concept and same month.  The second invoice is for $16,549.90.  (Mr. Jacobs later addresses this particular discrepancy.)  Ms. Más noted that the difference are the 2 cuerdas of preferential area.  The first invoice includes the 2 cuerdas and the second invoice stopped charging for those 2 cuerdas.  Invoice number 0583 is for the rent for November in the amount of $14,216.56.

CIVIL 08-2335 (ADC)                    25

A summary of invoices is reflected in an oversized chart, Exhibit 52, which reflects how the rent varies and also the removed space, as well as the lack of notification to plaintiffs that the preferential area was  eliminated.  The first nine invoices were paid, but then they received an invoice for the same concept for $66,597.73, an  invoice which was for the same area 129,000 square feet (3.55 cuerdas) since the beginning of the year.  Plaintiffs were the only user of the terminal.  Then, with  invoice 480, there was a reduction in rent for October, reflecting the eliminated 2 cuerdas of preferential area.  For the first time, parking was invoiced although it is public, and used  by federal agencies, passengers, Holland Group personnel, and by visitors in general.    On November 30, 2008, the invoice was for $14,216.56, which reflected the difference of 4,000 square feet being eliminated from Marine Express without previous notice.  Plaintiffs had not been shown the tariff notice relating to rental, and no assessment of land value had been shown to them.  The December rent was never invoiced, nor January 2009.  Thus plaintiffs have been consigning the rent in the court for the October through  January 2009 rent, based on $9,118.62 per month.

Referring to Exhibit 43, the port of Mayagüez diagram, Ms. Más showed what was taken away (using a red pen).  In October, the preferential areas were taken away.  In October and November, 2008, the 4,000 square  feet in front of the Marine Express' office was taken away.  Plaintiffs have the remaining office,

CIVIL 08-2335 (ADC)                    26

warehouse, Marine Express workshop and the three offices of Corporación Ferries del Caribe.  Marine Express was being charged for parking area (1st parking areas on left of the map).  Five or six parking spaces are assigned to plaintiffs but outside of that it is a public parking area.

Ms. Más referred to Exhibit 32, a letter dated November 5, 2008, from Tony Jacobs, representing José González Freyre, to plaintiffs and to Maribel Más.  The fourth paragraph informs that what she sent on August 10, 2007 was evaluated 14 months later and therefore plaintiffs are getting invoices for September and October.  It gives five days to send alternatives, and says that plaintiffs never sent them any.  Ms. Más said that was false because on October 8, attorney Carlos Bayron sent proposals.  Holland Group informed plaintiffs that negotiations had ended.  Holland Group called Nelson González and told him if he wanted to negotiate with the Commission, good luck, and they hung up the phone.

Ms. Más noted that plaintiffs' previous preferential area is being used for containers that have free time or are released prior to free time.  In some parts of the Mayagüez port, sections of a statue of Christopher Columbus, built in Russia and  previously stored in Cataño, are placed.

In a letter to Mr. Bechara, president of the Mayagüez Port Commission, dated November 5, 2008 (Exhibit 33), Ms. Más tells him that because of the Holland Group and plaintiffs' issues, plaintiffs ask the Mayagüez Port Commission for an emergency meeting to explain the situation in the port of Mayagüez.

CIVIL 08-2335 (ADC)                              27

Exhibit 34 dated November 12, 2008 is a letter by Carlos Bayron to Dennis Bechara, and is a second complaint or follow-up for wrongful invoices of Holland Group to plaintiffs.  On that date, plaintiffs filed a complaint before the Federal Maritime Commission.  Exhibit 35 is plaintiffs' presentation before the Mayagüez Port Commission establishing the situation they had in the Port of Mayagüez and Holland Group's aggravating conduct and invoices reflecting increases of 833%, as well as additional invoices which are illegal since they did not comply with the tariff and lack supporting documentation.  Also complained of was their taking away plaintiffs' credit line, notwithstanding plaintiffs' excellent line of credit. Plaintiffs told the Mayagüez Port Commission about the letter they got from Holland Group, taking away plaintiffs' facilities, telling plaintiffs to leave the office spaces, and threatening to shut off the air conditioning.  Plaintiffs reviewed the proposal which was never taken into consideration, and established details to the risk if there was a refusal to allow the docking at the port of Mayagüez.  Plaintiffs also related their background in operation for 16 years.  Plaintiffs informed them of the filing of a complaint before the Federal Maritime Commission and that if the situation were to continue to be aggravated, they would request an injunction. That was the 13th.  On November 14, plaintiffs received letters from Holland Group (Exhibit 36), and a letter from the Mayagüez Port Commission returning to plaintiffs their complaints of improper invoices and that they should send them to Holland Group.  Exhibit 37, dated November 14, 2008, is a letter by Tony Jacobs,

CIVIL 08-2335 (ADC)                    28

port director of Holland Group, addressed to Maribel Más.  In this letter, plaintiffs are requested to clean area "F", which is the preferential area, taken away in October.  They received an invoice for $1,020 for the cutting of grass where there is no grass.

Ms. Más explained that if a vehicle is not allowed to enter Puerto Rico and authorities decide it cannot enter, or if they seize it, in the past, they would leave the seized vehicle in port and then the authorities later disposed of those vehicles, but with passengers they would leave them and plaintiffs do not have jurisdiction over those vehicles.  Plaintiffs would tell the municipality but nobody would take the responsibility for withdrawing them from the port area and they were placed in the preferential area.  About a year or one and a half years ago, plaintiffs issued a notarized writ and moved the inventoried vehicles  to a private lot and reported this to the police department division of stolen vehicles.  Those vehicles are still in the private lot.

The second letter of Exhibit 37, November 14, 2008, is from Tony Jacobs, port director of Holland Group to Maribel Más.  It announces the increases in advance (prepayment charge) which they had to provide since October 24, in order to receive the vessel from $6,000 to $7,500 per docking.  This covered docking, wharfage and water provided for the vessel exclusively.  Ms. Más considered a reasonable amount to be $5,600.  They talk about a high season which did not begin on the date they have.  Historically high seasons begin

CIVIL 08-2335 (ADC)                    29

Christmas, mid-December to mid-January, and summer, second week of June to first week of August.  There might be another high season like Thanksgiving or Lent.

The vessel Caribbean Express has 168 entries per year.  Since 1993, it has had 2,500 entries, and has paid in docking charges approximately $1,300,000 per year.

Ms. Más referred to Exhibit 38, a letter dated November 17, 2008, from the Mayagüez Port Commission to plaintiffs.  The Commission returned plaintiffs' complaints so plaintiffs forwarded them to Holland Group.  On November 25, 2008, plaintiffs filed this request for injunction.

Ms. Más referred to Exhibit 40, Resolution and Order by Mayagüez Port Commission, in relation to improper invoicing and referring to Holland Group. Then on December 15 2008, the Mayagüez Port Commission made a ruling concluding that the Commission can fine the defendant an amount per occurrence if it is determined that there are unauthorized charges inconsistent with the regulations.

Ms. Más explained that plaintiffs have about 600 employees.  Plaintiffs carry commercial debt of about $16,000,000, and monthly expenses of about $3,000,000.  They are currently seeking loans.  Ms. Más, a C.P.A., deals with the finance departments of the three companies.  She knows the debt through the monthly financial statements.  If the vessel has no docking permit in the port of

CIVIL 08-2335 (ADC)                        30

Mayagüez, it has to return to Santo Domingo because there is no other port prepared in Puerto Rico which can receive this type of vessel.  If it has to return to Santo Domingo, this has a domino effect, so all the subsequent trips are damaged, and there is damage to the companies plaintiffs deal with, damages caused because they rely on the frequency and regularity of the voyages.  Holland Group cannot interrupt plaintiffs' itinerary.  The vessel has to persistently dock at the port of Mayagüez or there would be an impact financially.  They could not operate, could not pay their responsibilities, and expenses, and sustain jobs, thus closing the business.

Ms. Más stated that because plaintiffs have no preferential area at Mayagüez, they are operating with much difficulty, and have equipment in different places, in several lots of land, and on the street and therefore that equipment is assuming risks which they did not have before, as well as the additional costs.

Ms. Más explained that Marine Express is the common carrier from Mayagüez to Santo Domingo.  Because of the current situation, the employees feel that plaintiffs are not going to have operations in Mayagüez.  Ms. Más explained that there is no other user for the port of Mayagüez, and that there are no other ports in Puerto Rico which can receive this type of vessel.

On cross-examination by attorney Cancio-Bigas, Ms. Más emphasized that the position of the company is that the Caribbean Express is a cruise ship that

CIVIL 08-2335 (ADC)                    31

transports cargo; it is a hybrid.  Western Holding Group is the owner, and Marine Express operates the vessel.  Marine Express is recorded as a common carrier in the Federal Maritime Commission.  Ms. Más does not know how the port of Mayagüez classifies the vessel.

Ms. Más explained that plaintiffs pay docking fees, wharfage fees and a special charge for ferry service inbound and outbound.  The tariff (Exhibit 15, at 113, § 16.4.1) states fees for passengers of charters for 2008 to be $12 per passenger.  Marine Express does not pay this fee.  They pay $1.50 per passenger per route.  Section 16.5.3 of the tariff says that the fee applies for ferryboats in the port of Mayagüez.  This is the one that applies to plaintiffs' hybrid product although there is no hybrid distinction under sections 16.5.3 and 16.5.4 of the tariff.  This is not Ms. Más' interpretation, but rather, Holland Group making the interpretation.  Plaintiffs pay $1.50 per passenger per route.

Holland Group entered into a contract to begin operating the port on May 7, 2007 and in August 2007 began managing the port.

Referring to Exhibit 20, Ms. Más' letter in response to the invoice for $66,597.73 from Holland Group, she noted that plaintiffs' position is reflected there and they are not in agreement with the amount invoiced.  While the contract with Puerto Rico Ports Authority concluded and expired on January 28, 2008, plaintiffs maintained paying $9,118.00 a month.  Plaintiffs had tried to negotiate and initiated attempts and yet wishes to negotiate.  On September 30, 2008,

CIVIL 08-2335 (ADC)                    32

there was no lease agreement of Puerto Rico Ports Authority.  Plaintiffs have been paying pursuant to an implicit renewal "tacita reconducción."  Ms. Más reiterated, referring to Exhibit 20, that until defendants agree to sit down and negotiate, plaintiffs would continue to pay that rent.

Ms. Más reviewed Exhibit 21 with her lawyer, a letter dated October 1, 2008, sent to plaintiffs by Holland Group in 2008 giving them instructions to vacate the offices and workshop, and also stating, in the first paragraph, that plaintiffs had rejected the invoice for $66,000.  It also affirmed that plaintiffs had told Holland Group there was no contract with them.  Plaintiffs had told them they had not negotiated a new contract with Holland Group.  In the second paragraph, the letter noted that Holland Group would be invoicing port servicing strictly by the tariff published by the port.  Mr. Jacobs stated he would cancel the invoice, and Ms. Más understood that he had canceled that invoice.  Holland Group noted that it will not accept any rent to maintain the Puerto Rico Ports Authority contract which was rejected, and would not keep the contract active.  This was rejected by Mayagüez Port Commission and Holland Group, which resulted in Maribel Más' letter of September 30 regarding the implicit renewal.  Thus Holland Group was stopping the implicit renewal, saying there is no contract.

Ms. Más explained the "tacita reconducción," that the rental rate continued month to month, or according to the contract term, or until the landlord states that the contract is eliminated.  Nevertheless, Holland Group said plaintiffs should

CIVIL 08-2335 (ADC)                    33

evacuate the workshop shed and offices immediately since what takes place there is not consonant with the shipping business.  If this were to happen, the air conditioning would be eliminated and the United States Customs would have to exit the premises.  Holland Group never eliminated the air conditioning but it was out of order, damaged.  It has since been repaired, and was not intentionally discontinued.  Holland Group asked the United States Customs to start paying rent but Ms. Más did not know if they are paying rent.  She stated that no services had been discontinued, because upon plaintiffs' requesting the injunction, all threats stopped.  The threats included the closing of the port on October 23, and a request for payment for cutting the grass on November 14, as well as inapplicable demurrage charges.  She believed these were retaliation for not accepting the new rent.  There was prepayment of the docking fee.  Ms. Más related that Mr. Jacobs' letter explained that if there was no prepayment, the ship would not dock.  While there was a delinquent account with Holland Group, it was because of the unlawful invoices that they were unable to sustain.  The daily invoices for operations were always paid within 24 hours, including charges for wharfage, docking and water service to the vessel.

While the tariff does not deal with lease agreements between the Mayagüez Port Commission or port operator with the users of the port, she believed that an assessment should be done for a fair and reasonable rent.  Such assessment should include a comparison of similar places.  In Exhibit 16, a letter from Holland

CIVIL 08-2335 (ADC)                    34

Group dated September 9, 2008, Holland Group informs plaintiffs for the first time

of the rental rates of 800% more than what plaintiffs had been paying up to then.

Ms. Más said it could not be the assessment of the tariff because the tariff is just

and reasonable, and plaintiffs believe this is not.  Section 15, page 108 of the

tariff, the second paragraph, reads

> The precise rental rate applicable to a particular parcel of
> such land will depend at each facility at which land is
> available on assessments of land values and taking into
> consideration the size of the particular parcel under
> consideration, its location in relation to the waterfront,
> the service highways, the existing utilities, and similar
> factors which have a direct bearing on rental value.

(Docket No. 2-7, at 50, ¶ 2.)  The next paragraph at page 109 of the tariff, reads

> In accordance with the Port of Mayagüez policy, rental
> agreements, involving land at the Port of Mayagüez
> Marine Terminals, will provide for the re-establishment of
> the rental rate by the Port Administrator without
> limitation.

(Id. at 51, ¶ 1.)

Ms. Más stated that the port of Mayagüez is comprised of 19 cuerdas.

According to Exhibit 16, Holland Group was beginning to charge for office space

$4,129.26 per square foot and for work sheds $4,217.09.  The charge was $10

per square foot and for the  paved area, the rent was $32,413.98 at $7.00 per

square foot.  The non-paved area would be at $5.00 per square foot.  Inside the

preferential area there are paved and non-paved areas.  When she received

letters from Mr. Jacobs, she went back to him with a proposal for a reasonable

CIVIL 08-2335 (ADC)                    35

amount of rent, which is the rent being paid in other ports of Puerto Rico under the Puerto Rico Ports Authority.  She thought the proposed rent was excessive but also thought the rent established in 2003 was fair, the rent paid in other ports in Puerto Rico.

Referring to Exhibit 19, a letter forwarded on September 16, 2008 from Holland Group to plaintiffs, Ms. Más referred to the second paragraph where Mr. Jacobs says that the rent is what the other port renters pay and if plaintiffs want a discount for volume, they should request it.  Plaintiffs then sent an offer for discount for volume.  Plaintiffs reiterate that they believe that the fair rent is the rent paid at the rest of the ports, although plaintiffs did make an offer to increase the passenger fee on October 8.  Ms. Más does not know if profit is made in other Puerto Rico ports, and does not know if the ports of the government are meant to make a profit.  She felt it should be the same rent for plaintiffs, although Mayagüez is smaller and operated by a private operator.  She is not aware of the rents of the other clients in the port of Mayagüez.

Ms. Más referred to Exhibit 22, an October 8 letter to the attorney for the Mayagüez Port Commission, Mr. Sánchez, with copy sent to Holland Group.  Copies of the letter were sent to Néstor González, Dennis Bechara, and José González Freyre.  In this letter, attorney Bayron is trying to summarize the October 2 proposal to Holland Group.  This was plaintiffs' principal interest.  And

CIVIL 08-2335 (ADC)                    36

she said that it was agreed that the letter would be sent to the attorney of the Mayagüez Port Commission because their proposal would affect the tariff and the Mayagüez Port Commission would have to evaluate it.  Plaintiffs' proposal would mean a temporary adjustment to the tariff while Holland Group matured as a firm. When asked what entities are allowed to propose new tariffs, Ms. Más stated that she understands that proposals come from the Commission, or whomever administers the same, and from plaintiffs, as agreed to.  Referring to page 17 of the tariff, the last sentence of definition, she read: "The port administrator is the party responsible for proposing any new rule and amendment."  She said that all three parties were at a meeting on October 2, and all agreed as to what was to be done.  Nothing happened with the proposal of Mr. Bayron made on October 8. The proposal was made to Holland Group.  In the letter of October 10, in the second paragraph, plaintiffs make reference to the meeting of October 2, making reference to the negotiation process.  In the October 14 letter by Tony Jacobs (Exhibit 24), he refers to her complaints in her October 10 letter (Exhibit 23) concerning the charges that were being made by Holland Group, because there were no supporting documents and some invoices were for charges in arrears. Mr. Jacobs states that the procedure is that it has to be paid first and then disputed, but Ms. Más explained that that is when they are complete and those invoices are not, they have no supporting documents.  This is an incorrect

CIVIL 08-2335 (ADC)                    37

application of the tariff based on the lack of supporting documentation.  Thus, both provide reasons not to pay.  As to the vessel manifest and the tariff, the issue of the invoices is before the Mayagüez Port Commission at the present.

Ms. Más related the incident of October 23, when Gate 5 was closed without prior notice.  Nobody was told this would happen.  They could not find Mr. Jacobs and left him a message.  They called the Mayagüez Port Commission to intervene, considering  the vessel would arrive the next day at 8:00 A.M. and the vessel had to dock.  Containers of Marine Express were stopped, although not vehicles.  On the following day, the matter was resolved.  The Mayagüez Port Commission said it would call Holland Group.  Holland Group referred to the invoices that plaintiffs had not paid and that was why Gate 5 was closed.  Plaintiffs were then required to pay in advance and had to make a prepayment in order for the vessel to dock. After October 23, 2008, Holland Group has not interrupted plaintiffs.

Ms. Más opined that there were no more obstacles because of the Federal Maritime Commission filing and this injunction proceeding.  No more transiting containers have been stopped.  However, every day Holland Group demands a check based upon each exiting container and plaintiffs have to pay demurrage for any containers remaining in the port for more than six days.  If there is no check, the container cannot leave.  She noted that plaintiffs have never owed the defendants anything, and that the defendants refuse to negotiate with them.

CIVIL 08-2335 (ADC)                    38

Referring to the tariff at page 64, section 7.31, it describes payment of invoices and the consequences of not paying.  Section 7.32 notes that delinquent accounts have a 9% annual arrears rate.  Accounts that are delinquent become due immediately.  Invoices are payable in full although the vessel owner has the right to dispute.  Ms. Más disagrees that plaintiffs' account was delinquent, and that it is unreasonable to pay over $100,000 in 23 days.  She did not follow the procedure.  Plaintiffs paid the rent every month but the rent is not regulated under the tariff list and they have not paid the rent imposed by Holland Group at the arbitrary un-negotiated rate.  Notwithstanding section 7.34 of the tariff regarding prepaid operations, Ms. Más found the rent to be unreasonable and has been paying the $9,118 a month.

Ms. Más testified explaining what invoices have been paid by Corporación Ferries del Caribe or Marine Express as of the date of the hearing.  Since September 2008, plaintiffs have paid 100% of all invoices in relation to the docking of the vessel, and each one in relation to the rental, as corrected, that is, $9,118.  The rent from October to January has been consigned in this court, at $9,118 a month.  Plaintiffs have not paid any rent in excess of that originally established, and no excess has been paid since it has not been negotiated.  As to demurrage charges, those specifically for demurrage were paid under protest or otherwise the containers could not leave port.  Ms. Más has not talked to

CIVIL 08-2335 (ADC)                    39

Mr. Jacobs to discuss this matter since October when she asked for inventories of the invoices so they could evaluate them.  She felt the invoices are illegal and not subject to that procedure.  Ms. Más has looked at the tariff as it applies to her companies and does not know if the legality is described in the tariff.  About 22 or 23 invoices have not been resolved.  The first invoices relating to demurrage, from October 24 forward were corrected after plaintiffs showed their concern. These were paid.  Every time plaintiffs prepay, any excess payment is reimbursed. This happened in the first overpayments.   After that, there were no reimbursements made by the defendants and the defendants have a debt of over $30,000.  (There is no account to credit that amount.)  However, Mr. Jacobs has written that excess as credited to plaintiffs' account.

Looking at Exhibit 50 (Disputed Charge Claim Form), Ms. Más noted that she has used this form on more than 60 occasions.  The procedure is to complete the form, with a copy of the invoice claimed, and send it to Holland Group.  Holland Group then evaluates the claim and responds to some of them.  Some responses have been negative.  Basically very few, possibly none, have been favorably reviewed by Holland Group.  The majority have been denied.  Aside from the first three cases, there has been no adjustment after that.

Referring to Exhibit 48 (Docking Application and Permit), once completed it is used as the permit.  The request is for a specific date.  Now it is done the day

CIVIL 08-2335 (ADC)                    40

before because of prepayment.  The application is sent two to three weeks prior to   docking.   Then, so that the final permit is received, the check has to be delivered to Holland Group and the docking permit is then delivered.  In Exhibit 48, conditions 1 to 6 are terms and conditions whereby the ship is allowed to dock in Mayagüez.

Ms. Más noted that plaintiffs had filed complaints with the Mayagüez Port Commission and they were returned.  She did not know how the Commission dealt with the complaints since they were returned.  Before the filing of this case, the Commission told attorney Bayron that they had made an error and were then evaluating the complaints, by way of letter dated November 20, 2008.  The letter states that the Commission is evaluating the merits of the complaint for correctness of each one of the invoices for improper invoicing.

Ms. Más referred to Exhibit 9, dated May 25, 2007, a letter by Holland Group saying they were the managers of the port of Mayagüez, and asking plaintiffs what needs they had.  Plaintiffs then sent Holland Group what their  needs were. From then on, plaintiffs have not been able to negotiate with the port or with Holland Group.  Nor were plaintiffs ever heard in terms of their needs.  In August, plaintiffs sent their needs in details, and there was no response.  They had to wait for a tariff at the port (in March 2008).  In the reunion, there was an offer and counterproposal and no answer.  Ms. Más referred to Exhibit 16, dated September

CIVIL 08-2335 (ADC)                    41

9, 2008, as an assessment.  Mr. Jacobs never told Marine Express that this was

an assessment of land value for purposes of rentals.  There was no contract for

lease of the terminal by September 2008. Referring to Exhibit 18, dated

September 11, 2008, the letter to Holland Group opposing the rent of the $66,000

invoiced, Ms. Más notes that plaintiffs tell Holland Group about the Puerto Rico

Ports Authority rents, and that it was unjust, unreasonable and no negotiations

were conducted.  Plaintiffs also mention some attempts to negotiate.  Holland

Group did nothing about this letter.

Ms. Más made reference to the second letter, Exhibit 26, from Tony Jacobs

to Marine Express and its last sentence where he says that José González Freyre

said there is no agreement to settle any invoice and there is no negotiation

pending and that negotiations are concluded.  From May 2007 to October 2008,

plaintiffs received no draft of a lease contract for the Mayagüez terminal from

Holland Group.  Looking at Exhibit 32, 4th paragraph, from Tony Jacobs but

signed by José González Freyre, it says that Maribel Más' letter of August 10, 2007

has been evaluated (14 months later), that the analysis is concluded, and that the

rent is not $9,118 but $66,000 per month plus utilities.  There is still no draft

lease contract.

Making reference to the October 23 incident, Ms. Más noted that the

operational area of the terminal was closed, and that the containers had no access

CIVIL 08-2335 (ADC)                    42

to those gates.   The municipal police of Mayagüez were there controlling the

gates.  Holland Group has a control of the municipal police to control everything.

Plaintiffs prepay because they have not paid the 23 or 24 invoices which

have not been properly documented.   They pay more over the cost of the

operation so they have paid in excess of $30,000.  Referring to Exhibit 40, a ruling

of the Mayagüez Port Commission dated December 15, 2008, she noted the 3rd

paragraph which states that the 22 invoices lack sufficient detail.   Making

reference to Exhibit 50 (Port of Mayagüez Dispute Charge Claim Form), Ms. Más

said that the first time she received this was the second week of November,  after

the invoices totaling $122,000 were before the Mayagüez Port Commission.  She

filled out a claim form for each invoice.  Looking at Exhibit 48 (Docking Application

and Permit), she noted that the authorization at other ports is up to one month

before the docking.  One pays under the Puerto Rico Ports Authority 10 days after

the invoice arrives, with discount.   At the port terminal of Mayagüez, to get

authorization, one pays the day before the vessel arrives.  One pays and then one

gets the permit to dock.  If there is no prepayment, there is no permit to dock.

Referring again to Exhibit 48, term number 5, it states that the port will apply for

any claim of wharfage, cargo demurrage or any other amount owed to the port.

If there is a controversy, the vessel can be denied access to the port.  Thus,

plaintiffs' urgency, notwithstanding their credit's being excellent.

CIVIL 08-2335 (ADC)                    43


   Ms. Más admitted that the port administrator has never notified plaintiffs that the ship cannot dock, although there have been threats.  One reason that plaintiffs seek injunction is paragraph 5 of the Docking Permit, the fear that they might be restricted.  She noted that the air conditioning at the terminal is working.  All claims are before the Mayagüez Port Commission, and while plaintiffs have not been evicted, they have been notified of eviction.  They do not want to run the risks while the Federal Maritime Commission looks at the tariffs and its errors, and defendants' refusal to negotiate.  The docking permit does not arrive if plaintiffs do not issue the check.  Payment causes damage to plaintiffs' cash flow.  They get pre-charged because they have no credit with Holland Group due to outstanding invoices, and because Marine Express refuses to pay more rent than it would be paying with the Puerto Rico Ports Authority.  When the $600,000 was demanded, plaintiffs got upset.  After plaintiffs paid the September rent, and defendants collected it, then the first high rent bill came in.  They want to charge a higher rent and plaintiffs do not accept it.  On October 23, when Gate 5 was closed after 9:30 A.M., no containers could go through if demurrage was not paid.  The problem is not resolved.  Plaintiffs now have no preferential areas because Holland Group has removed them.

CIVIL 08-2335 (ADC)                    44

Ms. Más emphasized that payment is based on the tariff but the assessment must be made and it must be reasonable.  The tariff  regulates under what condition rent should be established.

Ms. Más said that the proceeding at the Federal Maritime Commission is to have Holland Group negotiate.  All the ports of Puerto Rico are regulated and plaintiffs want a ruling on the rent, since it is not regulated.  The Puerto Rico Ports Authority makes the rates and they are published.  They are not negotiated.

Ms. Más stated that no lease agreement draft has been tendered to plaintiffs from Holland Group, nor have plaintiffs tendered a lease agreement draft.  In April 2007, the Mayagüez Port Commission issued a draft contract which plaintiffs could not sign  because it disposed of 98% of the land they had rented.  With 3,000 square feet, plaintiffs could not operate the companies.  They objected to the contract, which brought the rented area from 129,000 to 3,000 square feet, resulting in a proportional 1,000 % increase in rent.  Finally, Ms. Más referred to Exhibit 33, a letter signed by her in the way of an emergency request to Mayagüez Port Commission to discuss the problem with Holland Group.  This letter was not notified to Holland Group.

TESTIMONY OF ANTONIO (TONY) JACOBS

Holland Group presented the testimony of Antonio (Tony) E. Jacobs González, who has been the port director of the Mayagüez operation of Holland

CIVIL 08-2335 (ADC)                          45

Group since May 9, 2007.  Mr. Jacobs holds a B.A. from the University of Puerto Rico, Mayagüez Campus, and has 30 years experience in manufacturing related to marine industry, raw materials arriving in ocean barges, vessels, and direct experience in operations and receiving material.  He explained that the city of Mayagüez transferred operation of the port of Mayagüez to the Mayagüez Port Commission, which  decided in 2006 to get a private operator to operate the port. In May 2007, the transfer began so that the Holland Group could start operating the port.  Holland Group began actually operating the port on August 10, 2007. Mr. Jacobs noted that Holland Group is a for profit operation.  There existed a contract between Holland Group and Mayagüez Port Commission. Holland Group operates the port daily and a tariff was implemented in March 2008.  All  users of the port must abide by the new tariff rates.

       Mr. Jacobs explained that Holland Group has certain obligations, like paying rent to the Mayagüez Port Commission, so that part of its income goes to the Mayagüez Port Commission.  Holland Group has a master plan in relation to possible operators of the port, and a long term development plan, to make the port more productive, considering the extensive properties which are not in use right now.

       Mr. Jacobs referred to Exhibit 43, a blue print of the port facilities of Mayagüez.  There are 19 cuerdas, three of which are fenced out because they are

CIVIL 08-2335 (ADC)                    46

in Starkist grounds, so there are really 16 cuerdas.  The blue print shows the west side parking area, small boats, terminal, and the United States Customs area for the processing of passengers.  The lower part of the print shows the operational area.  There is an area for sheds, Marine Express operations, FEMA, Customs, and Holland Group.  The vessel would be perpendicular to the lower edge of the area. As to the Starkist area, they are working with PRIDCO and FOMENTO to negotiate this area, but there is no immediate usage for the Starkist area, and it is not rented.

When Mr. Jacobs began at the port, the users of the port were Marine Express, a customs broker, René Ortiz Villafañe, a small cafeteria which is not there anymore, and United States Customs offices which use half of the terminal. Customs uses 14,000 square feet as well as areas outside the terminal.  United States Customs does not pay rent, and does not have a contract with Holland Group.  Customs had a contract with Puerto Rico Ports Authority and paid $1.00 a year before.  Holland Group negotiated with María Palmer of United States Customs and the response to negotiations by United States Customs is that it does not pay rent because it is the responsibility of the carrier who processes passengers at the port to provide facilities for Customs.  There was previously no rent allotted for the United States Customs Service, and nobody pays the rent for the Customs spaces.  Mr. Jacobs wrote María Palmer about the possibility of

CIVIL 08-2335 (ADC)                    47

signing a contract with Holland Group and United States Customs Service. Holland Group wrote to plaintiffs that it is the responsibility of the carrier vis a vis United States Customs Service to pay for at least the utilities used by people there.  Besides Marine Express and other companies using the port, Continental Shipping has offices there.  Eight cruise ships have come to Mayagüez.  In those cases, Customs uses a small amount of agents since most passengers are United States citizens.  On January 6, 2009,  a ship had 1,800 passengers and crew, and was inspected by one supervisor and four officers.

Mr. Jacobs explained that Marine Express' operation includes passengers which come from the Dominican Republic so the inspection is much different and it takes all of the United States Custom personnel at Mayagüez.  The Marine Express vessel arrives on Monday, Wednesday, and Friday at 8:00 A.M., unloads, and returns at 8:00 P.M. on the same day.  They unload, do maintenance and cleaning of the vessel for the passengers.  In the afternoon, there is cargo loading, then at 5:00 P.M. and 6:00 P.M. the cars, and finally passengers are loaded.  Referring to Exhibit 43, Mr. Jacobs shows the vessel in green marker.

Mr. Jacobs explained the Mediterranean docking system, which instead of normal docking, that is, docking side by side, the vessel docks perpendicular to the berth.  He also noted that the port has a navigation channel which the Corps of Engineers marks with buoys so there are channels which he marks in green on

CIVIL 08-2335 (ADC)                          48

Exhibit 43, and there are buoys which mark the navigation channel.  The length of the vessel Caribbean Express protrudes into the channel so this creates a problem for large vessels if one were to have to gain access to the port.  Small vessels have no problem but if a big vessel wants to come in, Caribbean Express has to go out and come back in.

Mr. Jacobs described the payment of utilities.  Holland Group pays the utilities.  The monthly utilities expenses for the port as of the summer of 2008 is about $14,000 to $17,000 a month for electricity.  The expense for water services varies from $18,000 to $23,000 a month.  Part of that water is sold to the M/V Caribbean Express and the balance is absorbed by the Holland Group.  Marine Express uses about 80% of the electricity of the port.  Most of the areas of the port are currently used by Marine Express.  Regarding the number of passengers, about  170,000, there are two seasons when they increase:  summer and Christmas.  In low season, there can be 200 passengers per trip; in high season, there can be 800 and over 1,000 passengers per trip.

When Holland Group began at the port in May 2007, the lease agreement was in place with the Puerto Rico Ports Authority.  That agreement ended in January 2008.  There was then an exchange of letters between the Mayagüez Port Commission.  The rent being paid by plaintiffs to Holland Group was $9,118, and

CIVIL 08-2335 (ADC)                    49

$700 for electricity and $400 for other utilities so the rent was actually about $8,000.

When Holland Group came into the port, it sent letters that they were the new administrators of the port and wanted to know the needs of the clients. (Exhibit 9.) Ferries del Caribe sent a letter to José González Freyre. (Exhibit 10.) They were told by Fernando Rivera, under-treasurer, and a port commissioner at the time, that it was emphatic not to negotiate with Holland Group during a certain period. No negotiations were to be conducted between Holland Group and plaintiffs in the 90-day transition. In relation to the negotiations, there are letters that reflect the negotiation of contracts. (Exhibit 14, letter of August 10 from Ferries del Caribe (Néstor González) to José González Freyre telling him of the needs of space allocation of the port.) Plaintiffs say they have 1,280 square feet, and four offices and asked for an increase of 1,500 to 2,780 square feet. In relation to operations areas, they have eight areas rented and 4,000 square feet for light mechanical work, and have 115,000 square feet in preferential areas, which they would be willing to temporarily reduce by 44,000 square feet, about one cuerda, since due to the frequency of movement of equipment, a lower amount would considerably hamper plaintiffs' operations. Their request was for 2.2 cuerdas. While they say there are 19 operational cuerdas areas, there are not. Referring to Exhibit B, an aerial photograph of the port of Mayagüez, the

CIVIL 08-2335 (ADC)                    50

(larger) blue areas reflect the preferential area that Marine Express has.  There are two work shops, the Marine Express office at the left parking lot, the preferential area next to the vessel, and the area on the right of the picture next to United States Customs Service.  The photograph reflects what the port looked like before the two cuerdas were delivered to Holland Group.  Marked in blue are the 2.2 cuerdas.  Starkist grounds are on the left.  A water tank is visible.  Holland Group now has the large preferential area of 2 cuerdas and the preferential area next to the area where the vessel docks.  (The vessel is visible in the photograph.)

Mr. Jacobs testified that Holland Group has business opportunities that they were evaluating, and noted that there is not that much other space to develop by Holland Group so that future opportunity would be outside the current 19 cuerdas.

When Holland Group came on, the Puerto Rico Ports Authority M-1-6 tariff (Exhibit 2) stayed in place until a new tariff came out of the Mayagüez Port Commission.  Until then, the old tariff was used.  Since there was no tariff, this influenced the negotiations.  Ferries del Caribe did not know the impact of a new tariff rate, and they were not in a position to negotiate a new contract because they did not know the effect.  The new tariff then took effect.  (See Exhibit 15, Handbook and Tariff No. 1 from Mayagüez Port Commission.)  Exhibit 15 also includes a letter from Mr. Jacobs to Néstor González, president of Ferries del Caribe, telling him the tariff will come in place effective March 15, 2008, and

CIVIL 08-2335 (ADC)                    51

inviting them to establish dates to negotiate a contract between Holland Group and Ferries del Caribe.  The communication notes that the tariff will cover the years 2008 to 2011.  Mr. Jacobs does not remember meeting with anyone from Ferries del Caribe, but Holland Group received answers that there were issues as to the tariff.  The invitation to negotiate was never answered.  Referring to Exhibit 16, Mr. Jacobs noted it is a letter from him to Maribel Más dated September 9. He stated that Holland Group had been trying to negotiate and the new rates for rent are notified plus additional fees for utilities.  Holland Group proposed $21 per square  foot for office space so that the annual rent would be $86,714.  The shed rate would be $10 square foot for an annual rate of $42,117 for 4,217 square feet.  Also provided for were the paved and non-paved areas.  Area F of the port was Starkist operations area.  The big preferential areas is both paved and not paved, and is in bad shape, filled in with mogolla (debris).  Holland Group does not count this area as paved although 80% of the area is paved.  Exhibit C is an enlarged photo taken from the top of the water tank in May 2007.  Mr. Jacobs took the photo himself.  It shows an unpaved area (in the preferential area). Exhibit D, a photo taken by Mr. Jacobs of the F area, shows the condition of containers and cars and other materials when Holland Group came to the port.

Referring to Exhibit 16, it provides for additional payment for utilities, which is 30% of actual invoice from Puerto Rico Electric Power Authority, and 30% of

CIVIL 08-2335 (ADC)                      52

invoice Holland Group  receives from Puerto Rico Acueduct Authority, subtracting

water sold to the ship.  It is a portion of what they use.  The attachment to the

letter is an invoice for the rent charges for that month.  In relation to the increase

of square foot charge, Holland Group reached those amounts by studying the

rents paid in similar areas close to ports and compared tariff rates on the Federal

Maritime Commission page (a link), where there is an infinity of tariff rates for

different ports.  The rent charged by Puerto Rico Ports Authority was also

considered.  Their rent is a totally different concept than that of a private

operator.  The response from Marine Express was to reject the invoices in terms

of the numbers and Marine Express kept sending checks for the amount that they

have been paying for the last five years, which checks Holland Group rejected.

If you add up the annual rent and the total square feet, it comes out to $6.00 per

square foot for all areas.  The rent is applicable to everyone in the port, including

the Bates Company, warehouse space to FEMA, and René Ortiz Villafañe who pays

$21, and also to Claro, who rented a space for two months, and who pays $21 per

square foot a month.

Looking at Exhibit 18, a letter dated September 11, 2008 from Maribel Más

to Antonio Jacobs, Mr. Jacobs noted this is plaintiffs' reply to Holland Group's

invoice of September  9, 2008.  In it, Ms. Más complains of the amount of rent

and utilities, and that the defendants have not answered letters in terms of

CIVIL 08-2335 (ADC)                    53

negotiations.   There is a statement of different rental rates.   Exhibit 19 is

Mr. Jacobs' answer to the letter stating, and not going into the details, that

Holland Group charges this rate to the other users of the port.   Holland Group

asked Ms. Más for the requirements of space and discounts and Holland Group

suggested a terminal tax per passenger, to transfer cost to the customers.   Exhibit

20 is a letter from Ms. Más to Mr. Jacobs, dated September 30, 2008, replying to

invoice 0351 for $66,597.63 for the rent for facilities.   Maribel Más rejects the

invoice in total and stated clearly that Marine Express has not accepted a lease

contract including the amount being charged.   She states that the last signed

contract was January 28, 2003, for a term of five years, that was their last

contract, that it expired, and that the contract has been implicitly renewed.

Holland Group interpreted this letter as Marine Express' acceptance that they have

no contract, and that Ms. Más is  paying the 2003 rent contracted with Puerto Rico

Ports Authority.

        Referring to Exhibit 21, dated October 1, 2008, it is a letter from him to

Ms. Más.  It notes that Holland Group will bill services of the port according to the

tariff.  Holland Group cancelled invoice 0351, and stated that it would not accept

any action of her company to continue the terms of the contract signed with

Puerto Rico Ports Authority to unjustly enrich itself all these years.   Terminal

building air-conditioning service would be eliminated.  That, however, did not

CIVIL 08-2335 (ADC)                    54

happen.  Mr. Jacobs explained that there are offices of Marine Express, where there is the selling of tickets, and half the terminal contains United States Customs.  The air conditioning to his office was in bad condition.  It broke down and it was decided to get a new unit.  One of Marine Express' offices was affected.  The terminal now has air conditioning.  United States Customs Service was never asked to deliver the premises.  No non-essential services were discontinued.  None of those measures were taken.  After this letter, Holland Group decided to invoice on a daily basis on every piece equipment that Marine Express had at the port.  In relation to the preferential areas, since there were none, every piece of equipment would be inventoried on a daily basis.  There was no more preferential area because of the letter of September 30 by Maribel Más stating that Marine Express had no contract with Holland Group.

In September, Holland Group had invoiced Marine Express about $66,000.  That invoice was cancelled after the letter, and Holland Group told Marine Express it would be invoiced at the end of each month, depending on the areas that Marine Express used.  Marine Express then decided to take some equipment out of the port, like chassis, junk cars, because they would be invoiced.  Referring to Exhibit C, Mr. Jacobs noted that this is area F,  the preferential area.  Some equipment is usable; some are old containers sitting there for years.  There is an area of junk and there are containers next to road number 64 which are not in use.  Marine

CIVIL 08-2335 (ADC)                    55

Express started taking the containers out of the port.  This photo was taken on May 25, 2007.  By October 2008, the status of the preferential area had changed. Marine Express took out the unusable equipment, and they left operation and workable equipment.  By the end of October, beginning of November, Marine Express had taken out the junk and car on top.  (See Exhibit D.)  They were out by August 2007, but in September 2008, there was junk there again.  Referring to Exhibit B, the aerial photo of the port taken from Google Earth, Mr. Jacobs noted different areas where there was junk.

Mr. Jacobs referred to Exhibit 24, a letter from him to Marine Express and Ms. Más, informing her she has an obligation with the tariff to pay the invoices immediately, and that Holland Group will evaluate them if they are wrongly invoiced once she pays.  Exhibit 25 is her reply to Exhibit 24, where Ms. Más says she cannot pay the invoices because of lack of information.  Holland Group said that it has the documents available at Holland Group's offices, but Ms. Más says she has to check them at her offices to see if the invoices are correct.

Exhibit 26 is composed of two letters dated October 23, 2008.  The first is from Mr. Jacobs to Ms. Más where he send her an invoice for $6,000 for operation of the vessel (prepaid operations), referring to section 7.3.4 of the tariff.  The next letter is canceling the credit privilege because Marine Express has not paid

CIVIL 08-2335 (ADC)                      56

any invoices, and notifying that any operations will have to be prepaid as to the tariff, since Holland Group had not received payment.

On October 23, 2008, Holland Group decided that since the credit privilege was revoked, all operations had to be prepaid, and any container in and out would have to be cleared out, so no container with demurrage or debt had to be cleared. On October 23, containers were let out of Gate 5 until 9:30 A.M. or 10:00 A.M., but after that, Marine Express dispatched all of their personnel because they did not have tools to verify demurrage, that is, the outstanding balance on demurrage.

On October 23, 2008, Mr. Jacobs was at his office at the port of Mayagüez. He was not contacted by anyone from Marine Express on that day.

On October 24, 2008, two commissioners from the Mayagüez Port Commission were present and one of them, Sergio Zeligman, went to his office and wanted to intervene. He did, and Marine Express started to make the process of the payments. So Marine Express would go to their accounting office, bring the check and then the container would go out. As of this date, the process of movement through Gate 5 is a normal operation. Fifty to sixty containers are cleared on a daily basis, and all have free time of six days. Marine Express is very careful and has no problem. Marine Express has paid no demurrage in the last

CIVIL 08-2335 (ADC)                              57

two weeks.  Marine Express has good records in relation to their containers and when the sixth day comes up, the container is taken out of the port.

Referring to the Google Earth picture, Exhibit B, Mr. Jacobs showed where Marine Express and other plaintiffs are located and where they operate.  All containers come from the road through Gate 5.  The middle white center office is Marine Express' dispatch office.  There, Marine Express inspects the condition of the container.  The container can use the whole operational area of the port for free time.  Referring to Exhibit B, there are containers that need repairs (below the white string of center buildings with blue borders) and Marine Express can also park containers in the former preferential area up to the end of free time, which is six days.

When asked if there has been a refusal to negotiate, Mr. Jacobs replied that he thinks there are 24 or 26 letters between Marine Express and Holland Group in relation to tariff and lease, spaces, and allocations.  From May 2008, there was a constraint that there was no published tariffs, and their publication took longer than expected.  On March 15, 2008, the tariff rate was published.  Marine Express said they preferred a published tariff and not having a tariff in place made a lease contract negotiation constraining.  So Mr. Jacobs invited Marine Express to pick dates to negotiate a new lease contract.  In later letters, Marine Express never mentioned a date to negotiate a lease contract.

CIVIL 08-2335 (ADC)                    58

Exhibit 28 is a letter sent by José González Freyre to Maribel Más discussing several tariff issues, and Mr. Jacobs mentions that he had a meeting with Ms. Más at his office two or three days before October 30, and she asked him if they could send her a draft of the lease contract.  The invoices were not actually paid since there was a dispute in relation to the tariff rate used by Marine Express.  They had meetings with Néstor González and they discussed invoices and crediting them and taking care of discrepancies.  He never received an answer from her; she came to the office to resolve doubt in relation to tariff, like free time.  Marine Express has been prepaying the invoices, and if there is an excess in the amount, it is credit to their account.  Other invoices relate to demurrage, etc., and they have not been paid.  There is a form of disputed charged, so this form is used as of October 1 until the present.  If the claim is approved, the amount is credited to Marine Express's account.  As of the previous week, $28,000 had been credited to their account.

Regarding proceedings in the Mayagüez Port Commission, Mr. Jacobs testified that from October 1 to October 22, 2008, there were complaints.  In particular, there was a complaint in terms of the condition of the port.  By December 1, 2008, Holland Group felt that this was taken care of.

Exhibit 29 is a letter from Marine Express to the Mayagüez Port Commission in relation to the condition of the port.  Mr. Jacobs described those problems

CIVIL 08-2335 (ADC)                    59

concerning driveways, potholes, ship fenders, sewers.  He testified that these problems were taken care of.  He noted that in Mayagüez it rains every day, and the driveway gets damaged so Holland Group gets a cement truck and roads are patched up with concrete in those areas.

On October 2, there was a meeting with Holland Group, Marine Express and Mayagüez Port Commission, to discuss the lease.  After that meeting, there was an agreement to establish a charge for the use of the terminal by passengers to help cover the new lease agreement for the new lease rates that Holland Group had established.  After that meeting, Marine Express sent a letter to attorney José Sánchez with a proposal with the new tariff rate, passenger terminal fee, but that letter should have gone to Holland Group, which is the party with which it had to negotiate.  The Mayagüez Port Commission was an observer, and has nothing to do with the lease agreement.  Marine Express cannot propose changing the tariff. The only entity to propose a change in the tariff is Holland Group, and the proposal has to go through them.  The Mayagüez Port Commission then returned the letter to Marine Express.

Exhibit 32 is a letter from José González Freyre to Maribel Más in relation to the application of the tariff.  If the tariff rate is not correctly applied, the letter refers Ms. Más to section 7 of the tariff.  In the letter, José González Freyre tells Ms. Más that the port operator determines the tariff, and the port administrator

CIVIL 08-2335 (ADC)                    60

is the only one authorized to propose future tariff changes.  The letter concludes

that if she wishes to request a lease, she must do so in writing, but that any such

request will not be considered while plaintiffs' account is in arrears.

Mr. Jacobs referred to Exhibit 36, a letter dated November 14, 2008, to

attorney Carlos Bayron,  noting the return of plaintiffs' letter of October 28, 2008.

Exhibit 37 contains two letters dated November 14, 2008.  The first is a reminder

that area F is not completely clean since the fences are in bad condition, and that

the area has to be clean before they completely vacate the area.  Holland Group

decided to clean the area of the fences and invoiced two days of work to Marine

Express as per the tariff.  Marine Express brought a digger to the area and started

to clean the area, made a small mountain of trash but never picked up the

garbage, which is still there.  To date, Marine Express has not finished cleaning

the area.  By letter dated November 14, 2008, there is a balance in plaintiffs'

account due to prepayments, and this has been credited to space rent and use of

the port.

Since the high season was approaching, that is November, the prepayment

was increased from $6,000 to $7,500.  Marine Express complied with this

prepayment.  In Exhibit 39, a letter to Marine Express, Mr. Jacobs relates the

condition of area F, and thanks Eric González (executive vice-president of Marine

Express) for his cooperation.  Mr. Jacobs noted that the dispute related in that

CIVIL 08-2335 (ADC)                    61

correspondence has not yet been resolved and that there has not been any other change in area F.

Mr. Jacobs referred to Exhibit 51, reflecting changes after October 1, 2008. The photos were taken on November 14 and 15, 2008. The 5th photo from back to front is the east part of the preferential area.

Mr. Jacobs described the Mediterranean docking system, where the vessel docks from stern to berth in the port. He said that Mayagüez is not the only place where a ship can be docked like that, and that there are barges which dock like that in San Juan bay.

Mr. Jacobs said that if an injunction is issued, it would effect Holland Group finances because most of its income is from Marine Express, and Holland Group has not received the rent.

On cross-examination, Mr. Jacobs noted that the port of Mayagüez had been operated for 30 years by Puerto Rico Ports Authority. In 1984, the port was transferred to the city of Mayagüez which looked for a private operator. After a request for proposal, Holland Group was one of two original groups that took part in that process. In April 2006, Holland Group was incorporated.

Mr. Jacobs explained that he is not an officer of the corporation, but rather has been port director since May 2007. They were given a contract to transfer operations for Holland Group to operate the port in August 9, 2007 (when there

CIVIL 08-2335 (ADC)                    62

was a 90-day transition process).    During that time, Holland Group made documentation of inventories.

Mr. Jacobs had previously worked for Pan-American Grain as operations manager in San Juan Bay, where José González Freyre is also president.  Pan-American Grain has never operated a common carrier marine terminal.

Mr. Jacobs stated that the rent at the port is set by the Board of Directors of Holland Group, composed of the president, vice presidents, and treasurer.  In 2008, those were José González Freyre, Sarimila Méndez, vice president, Frank Haake, vice president, Alberto Fernández, secretary, Osvaldo Fernández, treasurer.  The name Holland Group is relates to Frank Haake, who is the consul of the Netherlands in Puerto Rico.

Mr. Jacobs stated that he has never taken a course in the operation of a public marine terminal that operates with common carriers.  When Holland Group took over the operation, he knew the port terminal operation was high regulated. The marine facilities security plan is in place and was discussed within Holland Group.  Mr. Jacobs was aware that there has to be just and reasonable treatment of the tenants at the port.  He noted being conscious of federal regulations and running a port facility with just and reasonable practices in relation to the users. He also noted being aware that he can not impose an unreasonable disadvantage, or prejudice in relation to users to that port, and that Holland Group had to

CIVIL 08-2335 (ADC)                    63

negotiate in good faith with users.  He does not know if Holland Group did a due diligence.  Holland Group was aware of the size and income of the port, users and operations of users, rent paid, and electricity history.  They also knew the history of the water, and knew that the Puerto Rico Ports Authority tariff was being applied.  They also knew that United States Customs Service had a full contingent operating there.  They knew that PRIDCO had an operation on adjacent lands, and that there was a possibility that the Mayagüez Port Commission could acquire other areas in the future.

Mr. Jacobs noted there was a disputed area of sorts, the difference between 16 and 19 cuerdas.  There are 3 cuerdas in dispute, under the jurisdiction of the port of Mayagüez, PRIDCO, Impress Canning Co., (left of round tower on Exhibit B, Google map).  Holland Group is still in negotiations with PRIDCO.  There is a lawsuit pending.  Holland Group Port Investment Inc. knew about the controversy when it acquired operating the port.  When it took over the operation, it had the same problems as any start-up.

Mr. Jacobs noted the first invoice to plaintiffs were during the first week of August 2007.  The September invoice was from Holland Group Port Investment for $9,118.82, which was for rent.  He reviewed the same.  It was for 129,000 square feet, in the facility of the port of Mayagüez terminal.  Similar invoices were

CIVIL 08-2335 (ADC)                    64

sent to plaintiffs in October, November and December, 2007 and all said rent.  An assessment of land values was performed by Holland Group.

In January 2008, another invoice was sent to plaintiff for the rental of facilities.  (See Exhibit 1, chart.)  In September 2008, an invoice was sent for $9,118.82.  Before this invoice was sent, Holland Group conducted an assessment of land values, specifically beginning in the summer of 2008.  This assessment was never given to plaintiffs.  He noted that Exhibit 16 is not an assessment of land values, but rather the end result.

From September 1 to 9, 2008, nothing major occurred at the port, no catastrophes, no emergencies.  Holland Group did not sit down with the plaintiffs to negotiate a new rent or new lease, nor to tell them that they had to negotiate a new rent.  The new invoice was for $66,597.73 in September 2008, more than a 700% increase.  During that period, there were no improvements to the port.  Mr. Jacobs is aware that under the Shipping Act, the value of what is charged has to be reasonably related to the charge, and stated that nobody in the area of Mayagüez pays 79 cents per square foot.  It has to be reasonably related to the services provided.  Exhibit 16 breaks down the charges but the Mayagüez tariff has no provisions for rent.

In February 2008, Mr. Jacobs went to the Federal Maritime Commission website to study rates at other ports.  He looked at the ports of Seattle,

CIVIL 08-2335 (ADC)                    65

Baltimore, Miami, Pensacola, Cape Canaveral, maybe 20 or 25 ports and their rates.  Most tariffs do not have rents like in Puerto Rico.  In those tariffs, he saw land use for containers in some, but denied that some have land rates less than in Mr. Jacobs' memo since there is no rate for land.  The rate depends on paved, unpaved areas, and office spaces.  He denied that many were less than what appears in the September 9 letter and believed that only one is lower than in his proposal.

He did not look at tariffs for Los Angeles and Long Beach.  While he consulted the Federal Maritime Commission website, most of his assessment was based on properties in Puerto Rico.

Office space in the Mayagüez area for the tenants of the port is $21 per square foot.  A study was made in the Mayagüez area by Sarimila Méndez in relation to the rates in the area.

Mr. Jacobs acknowledged that the facility is highly regulated by Federal Maritime Commission and that notwithstanding this regulation, he personally did not consult with an economist or a real estate expert.  In relation to traffic volume, Mr. Jacobs noted that the port receives perhaps one vessel a month aside from the Caribbean Express.  One cruise ship comes in every four or five months. Holland Group did not compare the port traffic with other ports, because one does

CIVIL 08-2335 (ADC)                           66

not have to be an expert to realize the substantial difference in traffic, even comparing the traffic with the San Juan port.

Mr. Jacobs stated that the lowest rental in the local areas in Puerto Rico were probably from $6.00 to $7.00 a square foot.

As to other charges, referring to page 3 of the port of Mayagüez tariff, Exhibit 15, it says 2% increase per year for other charges.  Holland Group did not necessarily agree with the decision of the Mayagüez Port Commission in relation to the increases in tariffs, while agreeing that there is a big difference between 2% and 750%.  Reviewing Exhibit 2, it states that the rent for uncovered areas is 25 cents per square foot under the Puerto Rico Ports Authority tariff applied in San Juan.  (Exhibit 15 says $7.00 or $5.00 per square foot.)

The tariff in Exhibit 2 applies in Isla Grande, in the area next to the Puerto Rico Convention Center, next to the airport and near Caribe Hilton Hotel.  (San Juan is 11th busiest port in the United States.)

Mr. Jacobs noted that increased rates are being charged to other users: Bates, Villafañe, Claro Cellular, Inc., Trofima Co., and that  none of these is a non-vessel operating common carrier (NVOCC).  Only Villafañe has some connection with a maritime business.  Referring to Exhibit B, Mr. Jacobs noted that Bates is not visible at the right of the picture, and that it would be at the right bottom part of the picture.  The port terminal is at the bottom right, so Bates would be to the

CIVIL 08-2335 (ADC)                    67

right of the port terminal.  Bates is not located in the operational area of the port.

Bates has containers that are converted into and used as temporary offices

spaces.  The contract with Bates was signed in May 2008.  Bates has a lease

contract.  They pay $5.00 per square foot, which is a rate for preferential land use

for containers.  Claro is inside the terminal, and has a booth for selling cellular and

cell phone cards.  They operate three days a week, the days the Caribbean

Express is in port.  They have a lease with Holland Group.  Holland Group drafted

the lease.  Bates' lease was also drafted with Holland Group.  Mr. Jacobs

negotiated the lease.  Claro Cellular has a movable booth and pays $21 per

square foot for 150 square feet.  That lease started in November 2008.  Trofima,

Inc. distributes merchandise like rice and coffee and other merchandise, all of

which arrive via land transportation.  In Exhibit B, one can observe that it is

located in the  long blue lines shed, and is located in the left half of the far right

roof.  Trofima pays $10 a square foot.  Trofima Inc. is also related to Pan-

American Grain, and has a year long lease, of which seven or eight months have

run.  The area leased is about 250 square feet but less than 300 square feet.  It

comes by land transportation.  Villafañe customs broker has 500 to 600 square

feet, a comparably small area.

Mr. Jacobs noted that in response to the September 9 letter, Marine Express

sent Exhibit 18, discussing the rent being raised.  If one reads all of the letters,

CIVIL 08-2335 (ADC)                         68

the result is a back and forth as to whatever those letters say relating to the negotiations or lack of the same.  Mr. Jacobs noted that the lessee did not prepare any lease although Holland Group received letters in relation to Marine Express's needs.  Holland Group did not expect a draft of a lease contract from Marine Express.

Mr. Jacobs testified that he is aware of the elements that are taken into consideration in a lease contract.  Referring to Exhibit 16, he noted that Holland Group understood that Marine Express had no desire to negotiate a lease with Holland Group, notwithstanding the fact that Marine Express transports 100,000 passengers, 18,000 cars and 22,500 twenty-two foot Equivalent Units (TEU) a year and has some 600 employees.  He felt Marine Express was not interested in agreeing to a lease for the port of Mayagüez facility.

On September 29, Holland Group sent another invoice for the October rent in the amount of $66,597.73.  Mr. Jacobs consulted with the Board before sending this out.  Holland Group never considered public hearings before setting the rent. When the invoice was sent, and payment of $9,118.92 was made, Holland Group returned the payment, and told plaintiffs to leave a certain warehouse area immediately, an area not related to the operations of the Caribbean Express.  He explained that plaintiffs' shop area could be placed outside the port, since he

CIVIL 08-2335 (ADC)                    69

found it was not essential for the operations area in that those repairs can be done outside the port.  Trofima is not related to marine operations.

Reference was made to Exhibit 21 and the threat that all non-essential services to load and unload would be discontinued.  He considered the selling of tickets, and the offices in the terminal not essential to marine operations.

After the October invoice was received, a meeting was requested by Marine Express.  The meeting was held on October 2, 2008.  Holland Group, Mayagüez Port Commission, and Marine Express were represented, and negotiations were conducted.  There were offers made from plaintiffs to the Commission.  There was a problem because the letter dated October 8, 2008 had to be to Holland Group but was from plaintiffs to the Mayagüez Port Commission.  Holland Group thus understood it was not addressed to Holland Group and plaintiffs did not ask Holland Group to negotiate, so they determined that plaintiffs had a lack of interest in negotiating.  Nevertheless, Holland Group was at the October 2 meeting and at the meeting, there was no agreement that the letter was to go to Commission, with copy to Holland Group.  Holland Group understood that the October 2 negotiations ended on October 8.  Mr. Jacobs does not know why plaintiffs took that decision after Holland Group read the October 8 letter, because the letter is contrary to the spirit of the October 2 meeting.  Holland Group did not accept the September or October rent checks in the amount of $9,118.92.

CIVIL 08-2335 (ADC)                    70

Mr. Jacobs referred to Exhibit 30 which includes a series of invoices which were issued on a daily basis after the decision was made that plaintiffs did not want to negotiate with Holland Group.  Marine Express had said they did not have any contract with Holland Group Port Investment.  Then a different type of invoice began to be issued.  Invoice 357 dated October 2 is related to the inventory taken on October 1.  Similarly, there are invoices for $6,200; $6,900, $4,200, $3,500.  The total is over $111,000.  Invoice 357 is for equipment left at the pier without authorization.  SeaStar had previously gotten this type of notice.  The reference is made to section 16.6.3.1 of the tariff.  Section 16.3.3 relates to use of cranes and specialized equipment.  (See Exhibit 15, at 114.)  There are no cranes at the port since it is a Ro-Ro operation.  Equipment left at the pier is a specialized equipment.  Under section 16.6.3.1 "there will be responsibility for any violations of the Port of Mayagüez resolution or regulation concerning equipment left at the pier."  However, there is no such regulation.

For one day reflecting the inventory taken on October 1, 2008, the invoiced charge is $6,083.28.  That invoice was issued on October 2.  An inventory was made on October 1, 2008, and every day by Holland Group Port Investment.  An operator prepares a table every morning of each piece of equipment at the port, including containers, conveyors, trucks, etc.  The list is made and added up.  Such list is prepared by Harry Torres who then gives the list to Mr. Jacobs and the

CIVIL 08-2335 (ADC)                      71

accountant of Holland Group.  Marine Express has requested the inventories and

Holland Group has said they are available for review at the offices of Holland

Group.  Marine Express does the same thing; they have full information so they

know.  They have someone doing the same thing.  Mr. Jacobs testified that since

Marine Express has no contract, they should be doing the inventory.  It is not a

policy of Holland Group to invoice in this fashion.

Invoice 357 reflects 213 pieces of equipment left at the pier, counted by

someone from Holland Group.  That inventory is in the possession of Holland

Group.  Each invoice has a particular number.  For example, the invoice dated

October 7 represents the inventory taken on October 4, 2008 and is for 242

pieces.  No inventory is an estimate.  There is a very specific number on the

invoice.  Mr. Jacobs is quoted as saying "You can see it (the inventory) here but

we want to see your info."  Holland Group has to see Marine Express' inventory.

In daily operations, the common carrier provides a copy of all trailers and

inventories to the port administration, and based upon these reports, the port

administration invoices the port users.

Making reference to the resolution of the Mayagüez Port Commission,

Exhibit 40, there is an order that Holland Group provide documentation,

inventories of the containers to which demurrage was applied.  Mr. Jacobs did not

draft the reply to the order although he saw the same.  Holland Group has not

CIVIL 08-2335 (ADC)                    72

produced the information.  The resolution requires Holland Group to submit some information, including the supporting existing inventories.  In the response by Holland Group, they did not include the inventories.  Mr. Jacobs saw the response to the Mayagüez Port Commission.  At page two of Holland Group's response, at the end of the first full paragraph, it reads "it had proceeded to prepare the invoices on the basis of its best knowledge and  belief."  This is the response to the Commission.  Mr. Jacobs understood that there were supporting documents but he did not know what was sent to the Commission.

Mr. Jacobs explained that the carrier sends the vessel manifests to the Holland Group three times a week.  Looking at other invoices in Exhibit 30, Mr. Jacobs was referred to invoice 0402, dated October 7, 2008 in the amount of $2,210.72, a delinquency charge to Marine Express for not paying the October 2 invoice which was for $6,140.88.  The unit price for delinquency is $552.68 per day, the charge for which is reflected on invoice 357, multiplying 9% times $6,140.88 for the four days, for a total of $2,210.  This was wrong because it was done on a daily basis and should have been done on a yearly basis.  Holland Group told Marine Express, but it is one of the invoices of Exhibit 30.

Holland Group sent a letter on October 1 to Maribel Más explaining that Holland Group would be charging according to the tariff.  Holland Group came to a decision as a group, and understood that the rent relationship, and containers

CIVIL 08-2335 (ADC)                    73

were no longer under a rent situation.  This idea came from a letter from Marine Express, which dramatically changed the relationship among the parties, as to the concept of rent.  Reading this letter, Holland Group came to the conclusion that there was no contract in place between Holland Group and the plaintiffs.  Marine Express said it has not signed any contract, and further stated that they were not going to pay the rent that Holland Group intended to charge.  The letter from plaintiffs states that they want to continue the negotiations and the execution of a new contract.  The letter also says that plaintiffs will be available to negotiate with the defendants at any time.  Holland Group then rejected the checks because plaintiffs were not going to keep the terms of the previous contract.

There was a meeting on October 2, 2008, and unless Holland Group got a final contract, it would be invoicing on a daily basis, going to the tariff, and looking for the applicable daily charge, such as in section 16.6.3.1.  Mr. Jacobs never understood that he had to include the inventory with the invoice.  Marine Express sends the manifest of what they do, and with that and the TIRs, Holland Group would prepare the invoices.  Each day in October there is a corresponding invoice.  On October 24, there are invoices sent under the concept of demurrage, and Marine Express started to take its equipment out.  A week after receiving the $6,000 invoices, they took equipment out.  They told Holland Group that they still wanted a preferential area.  The tariff establishes a process for complaining so

CIVIL 08-2335 (ADC)                    74

that if you do not comply with the tariff, for example, not paying, then you have

to pay in accordance with 16.6.3.1.  Among the invoices that they had to pay,

referring to Exhibit 40, the first resolution of the Mayagüez Port Commission, (four

lines from the bottom), the 9% mistake was corrected once brought to Holland

Group's attention.  On October 23, 2008, Gate 5 was shut to the commercial

traffic unless demurrage was paid.  If the container paid demurrage, it could

move.  If not, the container could not move through Gate 5.  Mr. Jacobs learned

of the decision of Holland Group early that very morning.  There was a municipal

policeman at the front gate, as well as the alternate facilities security manager

who is also a policeman.  On October 23 at 9:30 A.M., Holland Group had not

invoiced Marine Express for any demurrage.  Mr. Jacobs did not recall receiving

any calls at his office, 787-832-3375, and did not recall incoming calls to his cell

phone, 787-398-0482.  Plaintiffs never requested his assistance at Gate 5 on that

date.

On October 31, 2008, an invoice was sent for the month of October related

to rent situation.  The accountant and Mr. Jacobs computed the rates.  Referring

to Exhibit 42, invoice 480, rental of facilities, he noted that this area which is used

by plaintiffs on a daily basis does not include area F.  Plaintiffs remained for the

whole month in the two sheds where the shop is located, (to the right, in blue,

near the power substation), in all the offices, and the parking area to the left of

CIVIL 08-2335 (ADC)                    75

Marine Express offices.   Therefore plaintiffs vacated area F and the lower

trapezoid preferential area next to the port on the Google map (Exhibit B).  Also

on Exhibit B are reflected 95 to 105 containers at the maximum.   After

October 31, 2008, at any given time, there are 30 to 40 containers.  There is a

movement of 50 to 60 containers because that is the capacity of the vessel.

Mr. Jacobs does not know where the containers went to, resting the difference of

95 to 105 containers, from the remaining 30 to 40.  Holland Group understands

that Marine Express does not have available the preferential area F, nor the

preferential area locating to the docking space, to the left of such space on the

map, AREA A.  (Google shows the Mediterranean berthing at the bottom.)

     Mr. Jacobs made reference to Exhibit 42 for the month of October, invoice

583, dated November 30, 2008, rent of facilities for November is $14,256.  The

difference with respect to facilities is that there is an area next to the power

substation, "AREA "B", shown in the blue box near and to the right of the power

substation.  This area was cleared and completely cleaned.  (It is located next to

Gate 4.)  It is a 4,000 square foot area, and there is nothing there right now.

Referring to  Exhibit 14, the area that he had been talking about as area B is not

area B, but rather area C, in front of Marine Express.  (On Exhibit B, area C is

shown to contain a white container.)  There was no longer any equipment left in

area B by November 2008.  The referenced letter corresponds to the attachments

CIVIL 08-2335 (ADC)                    76

to the letter received by Holland Group from plaintiffs in August 2007 in relation to what areas plaintiffs were interested in.   Those area designations have not changed.

    After the invoices of October and November, areas were taken away, such as area F.   Area A had also been removed.   Those areas are not in the invoices and those areas can be used by plaintiffs in a transitory way for their containers. All of the marshaling yards of preferential area were not being allowed since there was no contract.   They were being charged on a daily basis because there was no lease agreement.   A letter from Holland Group instructed Marine Express to vacate the area.   As a result of the negotiations, Holland Group made changes.   In all invoices from January to September 1, areas A and F, preferential areas are included, October and November, the areas are not included.   Mr. Jacobs as port director made the decision to remove areas A and F.   As a result of the removal of invoices, plaintiffs could not leave containers in the area where they used to leave containers so they had to move containers before the 6th day because they would then have to pay the demurrage penalty after the six (free) days.

    Prior to the October 2008 situation, there was a movement of 200 containers.   Mr. Jacobs does not know where those containers are kept.   There are two nearby areas, one right across from the port and another is an area called El Maní.   Some containers might be kept on the street.

CIVIL 08-2335 (ADC)                    77

In area F, no other common carrier keeps containers there now. From October 2008 to present, Holland Group has not negotiated with any other common carrier to keep containers in preferential area A or F, nor containers, nor any other type of property.

In relation to the position of Holland Group and the refusal to negotiate, Mr. Jacobs said Marine Express did not come to negotiate, notwithstanding Exhibit 18 (a letter listing the attempts to meet with Holland Group). Mr. Jacobs was referring to the letter of March 13, 2008 when Holland Group gave Marine Express the new tariffs, and the impact of the new tariff rates on their operations. Mr. Jacobs' position is that Marine Express made no attempt to negotiate notwithstanding Exhibit 20. Prior to October 2, the negotiation meeting, there had been no attempt to negotiate. After August 10, 2007, Holland Group never sent a draft contract to plaintiffs. Exhibit 22 says that on October 8, 2008, and based upon the meeting of October 2, 2008, the proposal was to the Mayagüez Port Commission for Holland Group to establish a new port service charge, which would transfer part of the cost to the customer. That proposal to transfer was given to the Commission by Holland Group. Exhibit 22 reflects Marine Express' view on the proposal, and Exhibit 25 is a summary of the meeting by plaintiff. There was discussion about the relation of lessor-lessee.

CIVIL 08-2335 (ADC)                    78

Referring to Exhibit 32, Holland Group notes the request of August 10, 2007, and that Holland Group took it into consideration and its invoices of September and October 2008.  Holland Group informs plaintiffs of the procedure to protest the tariff and that while payments are in arrears, no request for a lease contract will be considered.

Mr. Jacobs repeated that there is no other common carrier at the port of Mayagüez nor cargo liner services at Mayagüez right now.  There are tenants at the port which carry on non-maritime activities in nature.  There are other companies in Puerto Rico that conduct Mediterranean operations.  One of those companies, Crowley Liner Services, conducts Ro-Ro barge operations in Isla Grande, and they have a lease with Puerto Rico Ports Authority.  Crowley operates a specially built and designed three-level ramp structure to discharge barges that are three-level ocean-going barges.  Another Ro-Ro company, Trailer Bridge, operates in Puerto Nuevo, where there are three-deck and two-deck barges, and there is a specially built ramp barge to discharge stern-to-berthing, built specially for that operation.  In relation to Crowley, Exhibit 41 shows that they rent 81 cuerdas for $165,269, which would be $2,037.59 per cuerda.  That is with Crowley.  In Mayagüez it would be $18,500 per cuerda rate, more or less.  At Mayagüez, there is no three-deck barge which calls there.  Crowley and Trailer-

CIVIL 08-2335 (ADC)                    79

Bridge are in exclusive areas for the immediate area for the berthing under their contracts.

Mr. Jacobs repeated that United States Customs does not pay rent so that causes trouble.  He said how much space they take up.  The amount of space that Customs uses is included in the plaintiffs' area because that function is a necessary part of port operations.  The amount of area used by Customs (the only federal agency in the port) went into consideration in the 800% increase to $66,000.  Mr. Jacobs noted that plaintiffs should pay some or all of the United States Customs facilities there.  Mr. Jacobs knows that United States Customs used to pay $1.00 rent to Puerto Rico Ports Authority.  Making reference to the lease and development agreement between Mayagüez port and Holland Group Port Investment (Exhibit 3), under section 3.13 of the agreement, Holland Group is responsible for providing free of charge adequate space within the port of Mayagüez facility for the Commission to perform its duties.  Also included in the section is providing ancillary services to government agencies starting from a rate of as low as $1.00.  While the rent is still $1.00, Holland Group is negotiating as to utilities.

Mr. Jacobs stressed that if the injunction was granted, there would be financial harm due to the nonpayment of the rent, and that this would have an effect on the finance part of the operation.  In September and October 2008,

CIVIL 08-2335 (ADC)                    80

Holland Group rejected the payment for the rent from Marine Express.   After November, Marine Express received the rent invoices every month.   Marine Express then consigned the rent every month.

Mr. Jacobs noted that the last invoice was $17,000 but it was in error so a new invoice was made for January, 2009.  Corrected it would be about $12,000. In January it went from $14,000 to $12,000, and this included invoicing for the offices and shop areas which are being used by Marine Express on a daily basis. So if plaintiff would accept it, the rent would be $12,000,  but Holland Group is not including utilities, nor port charges and other fees.  Mr. Jacobs emphasized that Holland Group does not want Marine Express to leave the port of Mayagüez, and the Mayagüez Port Commission does not want Marine Express to leave the port of Mayagüez.  Marine Express brings business vitality to the Mayagüez area. Referring to Exhibit 3, it contains a clause which permits Holland Group to terminate the lease before December 31, 2008.  However, the lease remains in effect.

Mr. Jacobs testified that Holland Group has eight employees, of which three have salaries, and that the assessments are made by him and the executive group, and that they communicate daily.  They go to the port on a daily basis.

Again, Mr. Jacobs understood that Marine Express did not want to negotiate. There was an agreement between the parties that there would be no negotiations

CIVIL 08-2335 (ADC)                        81

until the tariff was in place so that everyone would know the effect on the finances of both parties.  The tariff became effective March 15, 2008, and there was a period after that so that if any party was not happy with the terms, there was a period, maybe 30 days, to contest or make a claim.  As far as Mr. Jacobs knows, there were no formal complaints made in relation to the tariff to Holland Group.

Mr. Jacobs explained the needs of the operator of the port, Holland Group, in relation to the cost of the operations, and that Marine Express, as a user of the port, paid rates that were extremely low for the amount of space they had in the port and the use of all other areas, and the preferential area, like 70-something cents per square foot, which, considering that they had 129,000 square feet, came out to $9,118.  What Marine Express pays does not cover more than 4% or 5% of the actual expenses at the port.

Making reference to Exhibit 22, a letter to the Mayagüez Port Commission, it appeared to him that plaintiffs did not want  to negotiate with Holland Group. The intention of the meeting was to start negotiations.  In this case, Marine Express bypassed the process about negotiations, and Marine Express knew that if they were going to establish a new tariff rate it would be through Holland Group, not through the Mayagüez Port Commission.

Mr. Jacobs explained the operations, and how Holland Group made money. It has a lease agreement to develop the port for 30 years.  Ten percent of the

CIVIL 08-2335 (ADC)                    82

income goes to Mayagüez Port Commission and another 10% goes into a fund which is dedicated to the infrastructure.  This income is derived from the rent. Mr. Jacobs explained the expenses of Holland Group.  These business expenses included payroll and utilities, the second most important expense, followed by security, homeland security rules, insurance, and benefits to shareholders.  So far this year, Holland Group has had losses closing its fiscal year, and is working on a deficit.  Customs rent is $1.00 a year.  As to utilities, the Customs and Border Patrol, in relation to the operation of the port, uses 75% of the port utilities.  They may have 35 to 40 inspectors, on a six-day basis, and use 14,000 square feet, out of a total at the terminal of 26,000 square feet, so they use most of the utilities. They use most of the air-conditioning, and most of the lighting.  Marine Express accounts for paying less than 10% of the utilities at the port.

Mr. Jacobs referred to Exhibit 30, invoices before the Mayagüez Port Commission which are unpaid.

Mr. Jacobs said that on October 23, 2008, Ms. Más was at the port, and heard that the instruction had been given that if a container had demurrage charges, it could not leave the port if the demurrage was not settled.  Thus, plaintiffs had to go to the agent, and then go to Holland Group to pay demurrage if the container owed demurrage.  Marine Express stopped working the dispatch

CIVIL 08-2335 (ADC)                    83

operation.  They could use the other areas of the port.  In November, 2008,  there were grass cutting charges to Marine Express.

Mr. Jacobs testified that if Holland Group remains in the status quo (if an injunction is issued) Holland Group would continue in a deficit, and it would affect its ability to pay suppliers and services to the port, and that it will be able to cover expenses only for a period of time.  The operation of the port would be affected very badly.

Mr. Jacobs noted, making reference to October 2, 2008, that Holland Group needed $600,000 for the operations of the port, and that José González Freyre had been discussing it after the audits and reviewing Holland Group's financial statements.  Taken into consideration were payroll for three employees, utilities, security, shareholder expenses (if the company makes money, they have the right to make some money), and $150,000 in electricity, as well as over $200,000 a year in water.  During high season, port charges from Holland Group can reach $72,000 to $75,000 per month.

Mr. Jacobs mentioned that the statue of Columbus is now owned by Russia, and is in the port (in parts).  He also noted that after all the changes in October, there were no big changes in Marine Express' operations, and while there is a desire to having a preferential area in a port, this is not a sine qua non for operating.  If Marine Express leaves equipment or containers at the port after a

CIVIL 08-2335 (ADC)                              84

certain number of days as established by the tariff, they will be charged for

demurrage.  He emphasized that Holland Group is not subsidizing the operation

of Marine Express inside the port of Mayagüez, and that most of Marine Express'

operation is now subsidized by Holland Group.  The containers flow but he does

not know where they are placed.  The problem is the containers that sit there for

a long time.   Holland Group is willing to rent the preferential area to Marine

Express.

PRELIMINARY INJUNCTION

The First Circuit uses a quadripartite test for determining whether litigants

are entitled to preliminary injunction redress.  Under this framework, trial courts

must consider "(1) the likelihood of success on the merits; (2) the potential for

irreparable harm if the injunction is denied; (3) the balance of relevant

impositions, i.e., the hardship to the nonmoving if enjoined  as contrasted with the

hardship to the movant if no injunction issues; and (4) the effect (if any) of the

court's ruling on the public interest." Ross-Simmons of Warwick, Inc. v. Baccarat,

Inc., 102 F.3d 12, 15 (1st Cir. 1996) (citing Weaver v. Henderson, 984 F.2d 11,

12 & n.3 (1st Cir. 1993); Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st

Cir. 1991)); see also Boston Duck Tours, Inc. v. Super Duck Tours, LLC, 531 F.3d

1, 11 (1st Cir. 2008); Ocean Spray Cranberries, Inc. v. PepsiCo, Inc., 160 F.3d

CIVIL 08-2335 (ADC)                    85

58, 60-61 (1st Cir. 1998); DeNovellis v. Shalala, 135 F.3d 58, 62 (1st Cir. 1998); Telerep Caribe, Inc. v. Zambrano, 146 F. Supp. 2d 134, 137 (D.P.R.  2001).

In the context of the Shipping Act, the Federal Maritime Commission is the primary forum for resolving disputes between marine terminal operators and common carriers.   See, e.g., Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth., 335 F. Supp. 2d 275, 279-80 (D. Conn. 2004); cf. Springfield Terminal Ry. Co. v. United States Surface Transp. Bd., 472 F. Supp. 2d 89, 90 n.1 (D. Mass. 2007).  The standard for issuing a preliminary injunction under the Shipping Act is the same as it is in a court of equity.  See 46 U.S.C. § 41306(c).

## (1) LIKELIHOOD OF SUCCESS ON THE MERITS

The defendants argue that the M/V CARIBBEAN EXPRESS is a ferryboat and thus exempt from the Shipping Act along with ocean tramp or chemical parcel tankers.  46 U.S.C. § 40102(6)(B).  The statute, the tariff and the defendants' brief are the only places brought to my attention which clearly use the term ferryboat, and the defendants' brief is the only document which refers to the M/V Caribbean Express as a ferryboat.  The term ferryboat connotes a small vessel which adopts the functions of a highway and becomes a water bridge between two locations which do not invite traditional bridge work.  See, e.g., Inhabitants of Town of Beals v. Beal, 98 A.2d 552, 554 (Me. 1953).  That it is a ferry and

CIVIL 08-2335 (ADC)                    86

operates as a ferry does not make it a ferry boat within the meaning of the statute, a statute which unfortunately does not define the term ferryboat.  This is a hybrid RORO ship which operates as a ferry.  The case of Alaska S.S. Co. v. Fed. Maritime Comm'n, 399 F.2d 623 (9th Cir. 1968) is illustrative of the problem. There, certain factors were noted as significant in determining whether a vessel is a ferry, factors such as "(1) the length of the run; (2) type of ship (whether open-end or closed ocean going), (3) whether it was operated under state franchise or federal certificate of convenience; (4) whether it was equipped to carry cargo; (5) the extent to which service to passengers is emphasized; (6) the extent to which its use is necessitated by lack of land transportation."  Id. at 627-28 (citing Canadian Pac. Ry. v. United States, 73 F.2d 831 (9th Cir. 1934) and Puget Sound Navigation Co. v. United States, 107 F.2d 73 (9th Cir. 1939)).  These factors clearly gravitate toward a finding that the M/V Caribbean Express is a vessel used as a ferry service but is not a ferryboat exempted from the operation of the Shipping Act under 46 U.S.C. § 40102(6).  Further, the evidence reveals that Marine Express and Ferries del Caribe operate the vessel and are common carriers under the Federal Maritime Commission.  (See Exhibit 44-47.)

The defendants are similarly found to be marine terminal operators or other persons as defined by the Shipping Act.  See, e.g., P.R. Ports Auth. v. Fed. Maritime Comm'n, 919 F.2d 799, 802 (1st Cir.  1990); see 46 U.S.C. § 40102(14-

CIVIL 08-2335 (ADC)                    87

15).  As such they have the obligation to "establish, observe and enforce just and reasonable regulations and practices relating to or connected with receiving, handling, storing, or delivering property." 46 U.S.C. § 41102(c).

Plaintiffs argue that the defendants' actions are in clear violation of the Shipping Act which creates reasonable and anti-discriminatory standards for marine terminal operators' regulations and practices.  See Plaquemines Port, Harbor & Terminal Dist. v. Fed. Maritime Comm'n, 838 F.2d 536, 546-47 (D.C. Cir. 1988).  The court must determine whether Holland Group has maintained unjust and unreasonable regulations and practices and has acted with unjust and unreasonable prejudice and has unreasonably refused to negotiate.  See 46 U.S.C. §§ 41102-106.  The Shipping Act does not prohibit or refusal to negotiate, but rather if such are unreasonable.  Plaintiffs argue that after the defendants unilaterally cancelled the existing terminal lease agreement, they proposed a terminal lease agreement that reduced the lease area from 128,886.87 square feet to 3,000 square feet, a reduction in operations area of 97%, even though the rest of the facilities were unoccupied.  Plaintiffs argue that this amounts to a constructive refusal to negotiate and an eviction of plaintiffs from the premises. Furthermore, the defendants unilaterally increased the rent payment in excess of 833%, plus 30% of all utility expenses of the terminal retroactively.  The monthly rent increased from $9,113.32 (based on the current Puerto Rico Ports Authority's

CIVIL 08-2335 (ADC)                    88

M-1-6 Tariff and rental rates for the port of San Juan, the rate plaintiffs wish to maintain) to $66,597.73, plus 30% of all utilities for approximately 3 cuerdas. The per cuerda charge under Puerto Rico Ports Authority's rate is $25,000, but the per cuerda rate under the defendants' unilateral increase is calculated at $304,920.

Plaintiffs further argue that when they strenuously objected to the October 2, 2008 demand from José González Freyre for $600,000, they were unjustly locked out from the cargo operations area on October 23, 2008, thus disrupting their cargo operations.  Ms. Más felt extorted when confronted with what can be described as either an extortionate demand or an inartful way of demanding a comparably large sum of money relying on what may be a valid, unwelcomed, crassly articulated but reasoned, business decision.  While the $600,000 figure appears to be an extortionate amount of money in plaintiffs' or a discerning reader's eyes, the amount is roughly the difference between what the previous  rent of $9,118 is and the elevated rent of $66,000 multiplied by the number of months it would take the deadline driven Federal Maritime Commission to render a decision on plaintiffs' complaint.  What plaintiffs envision as a failure or unreasonable refusal to negotiate is looked upon by the defendants as plaintiffs' unwillingness to follow the proper channels, to negotiate with Holland Group, and to entrench themselves in the Puerto Rico Ports Authority tariff rates.

CIVIL 08-2335 (ADC)                    89

The evidence is pellucidly clear that Marine Express strongly desires that the rent remain the same as it was under Puerto Rico Ports Authority Tariff No. M-1-6. (See, e.g., Exhibits 7, 8, 18.)  Indeed, Ms. Más testified that a reasonable amount of rent would be the rent that was currently being paid in other ports of Puerto Rico under the Puerto Rico Ports Authority applicable tariff.  Contrary to plaintiffs' argument, there is more than sufficient justification for the rate increase, notwithstanding there having been no improvements in the facilities of the port, a port clearly operating at a loss.

Seminal within the factors to be considered is whether Holland Group's actions are discriminatory, something which the Federal Maritime Commission would strive to proscribe.  Discrimination connotes treating one party unfairly when compared to the favorable treatment received by another party.  In considering a similar antidiscriminatory provision in similar legislation, one court noted that "Congress enacted this antidiscriminatory section to eliminate the secret discounts and preferential treatment carriers were giving to big shippers in the late 19th century." Paulson v. Greyhound Lines, Inc., 628 F. Supp. 888, 892 n.4 (D. Minn. 1986) (citing Louisville & Nashville R.R. Co. v. Mead Johnson & Co., 737 F.2d 683, 686 (7th Cir. 1984)).  Using other terms, discrimination would involve a preferred party, a victim of discrimination, and a violator.  A scenario lacking in one of these units, confronts a barrier to the allegation of

CIVIL 08-2335 (ADC)                    90

discriminatory conduct.  See, e.g., P.R. Ports Auth. v. Fed. Maritime Comm'on,
642 F.2d 471, 483 (D.C. Cir. 1980).  To the contrary, the relationship described
during the hearing is one of unwilling commercial symbiosis, depending further
upon public demand, and overseen by a regulatory scheme and a regulating tariff.
Mr. Jacobs testified that he is aware that the Federal Maritime Commission which
applies the Shipping Act prohibits discrimination between users at a port facility
that they regulate.  The difference between rent per square foot for a non-
maritime tenant and a maritime tenant, in terms of services, maintenance and
utilities, might very well have a basis in reality and to make distinctions in pricing
might not a fortiori result in the conclusion that such distinction is discriminatory.
In any event, Mr. Jacobs made it clear that  the rent charged to plaintiffs happens
to be what the other port tenants pay.  Cf. Petchem, Inc. v. Fed. Maritime
Comm'n, 853 F.2d 958, 963 (D.C. Cir.  1988).  Bates Company, FEMA, Mr.
Villafañe and Claro pay or paid $21 a square foot, the same rate charged to
plaintiffs for office space.  (See Exhibits 17, 18, 19.)  He ventured that if  plaintiffs
wanted a discount for volume, they should request it.

        Plaintiffs strongly believe the status quo should be maintained, while
defendant Holland Group believes that an unprofitable operation invites and
requires change, destroying the tacita reconducción which plaintiffs rely on but
which is clearly rejected by the last lease agreement signed by plaintiffs, which

CIVIL 08-2335 (ADC)                    91

agreement has clearly expired, (Exhibit 20), and which is not being honored by Holland Group, except by default while the Federal Maritime Commission adjudicates the matter before it.  While the Mayagüez Port Commission Act of 1958 allows rents to be altered only upon public hearings (see P.R. Laws Ann. tit. 23, § 555(l), the lease and development agreement between the Mayagüez Port Commission and Holland Group states that rents are not subject to the public hearings process in the tariff.  (See Exhibits 3, 15.)  Tacita reconducción would apply to the lease agreement if it had not been rejected in the contract which is the case here.  Further digging into the horn of plenty is fruitless.

In sum, plaintiffs do not have an enforceable lease agreement of any sort with Holland Group and is currently implementing the terms of the new tariff, the application of which is the subject of grievances before the Mayagüez Port Commission, and which tariff provides for procedures when there is a grievance regarding its implementation.  (See Exhibit 23.)

While plaintiffs may ultimately prevail at the Federal Maritime Commission, I cannot find that there is a high likelihood that this will happen given the information provided by plaintiffs that they wish to continue with the current rental (and are willing to negotiate) and by the defendants that they are commercially subsidizing plaintiffs while attempting to operate as a for-profit enterprise under non-discriminatory terms in accordance with the provisions of

CIVIL 08-2335 (ADC)                    92

a published tariff, (and are also willing to negotiate), not to mention the amount of correspondence between the parties which in the aggregate generate a feeling more of resolution than of dissolution.

(2) SIGNIFICANT RISK OF IRREPARABLE HARM

An injury will only be considered irreparable if no adequate remedy for the injury exists at law.  See Foxboro Co. v. Arabian Am. Oil Co., 805 F.2d 34, 36 (1st Cir. 1986); see also 11A Charles Alan Wright, et al., Federal Practice and Procedure § 2948.1, at 149-51 (2d ed. 1995).  Monetary damages are generally not considered irreparable injuries.  DeNovellis v. Shalala, 135 F.3d at 64 ("[A] temporary loss of income which may be recovered later does not usually constitute irreparable injury.").  It is not necessary for plaintiff to establish that denial of injunctive relief would be fatal to its business; it is sufficient for plaintiff to show that injury is not accurately measurable, given that irreparable harm is a natural sequel.  See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d at 19 (citing Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 551 (4th Cir. 1994); K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Cir. 1989); Danielson v. Local 275, Laborers Int'l Union, 479 F.2d 1033, 1037 (2d Cir. 1973)).  "Evaluating irreparable harm and its likelihood of success on the merits must be considered together.  The greater the likelihood of success on the merits, the less required showing of irreparable harm.  '[W]hen

CIVIL 08-2335 (ADC)                    93

the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief.'" Total Petroleum P.R. Corp. v. Colón-Colón, 577 F. Supp. 2d 537, 551-52 (D.P.R. 2008) (quoting E.E.O.C. v. Astra U.S.A., Inc., 94 F.3d 738, 743 (1st Cir. 1996)).  In the preliminary injunction context, irreparable injury is one that cannot be adequately "compensated for either by a later-issued permanent injunction . . . or by a later-issued damages remedy." Río Grande Cmty. Health Ctr., Inc. v. Rullán, 397 F.3d 56, 76 (1st Cir. 2005).

Plaintiff has not shown that without the preliminary injunction it would lose incalculable revenues and sustain harm to its goodwill.  Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d at 19.  The incalculable damage might well be lost revenues, harm to plaintiff's reputation, and alienation of future customers.  However, in this particular case, unlike most preliminary injunctions which are preludes to permanent injunctions, any possible injunction which might issue would expire *ex propio vigore* upon termination of the proceedings before the Federal Maritime Commission.  That would occur late this year at most.  Review of any determination at that agency would rest at the court of appeals.  In the meantime, while the parties to the preliminary injunction hearing operate in a state of vitriolic detente, plaintiffs have not provided the court with sufficient information to conclude that the implementation of the tariff, and any arguably

CIVIL 08-2335 (ADC)                    94

unreasonable failure of Holland Group to negotiate, would result in irreparable injury.  For the most part, the information regarding this fact was in the nature of conclusory allegations by Ms. Más, that it would be catastrophic, that jobs would be lost, that the service would shut down, that hundreds of jobs would be lost.  However, the evidence shows the resilience and resourcefulness of plaintiffs in the face of dramatically changing circumstances which rely on the governing tariff.  (See, e.g., Exhibit 27.)  Preferential areas have disappeared and containers and equipment in port for more than six days pay demurrage or find a temporary home elsewhere at an additional expense which is measurable.  There are details which may raise eyebrows, such as charges for cranes in a craneless operation, the cutting of grass where there is no grass, the cleaning of detritus where there may or may not be any.  There has been a major change in plaintiffs' operational realities and very probably a corresponding increase in expenses, again, all measurable.  Thus, the evidence does not clearly show that plaintiffs would not be able to weather the storm of change while it would prefer to continue a commercially comfortable status quo.

### (3) BALANCE OF HARDSHIPS

"Weighing the hardships of each party is a fact-driven exercise."  <u>Total Petroleum P.R. Corp. v. Colón-Colón</u>, 577 F. Supp. 2d at 552 (quoting <u>Telerep Caribe, Inc. v. Zambrano</u>, 146 F. Supp. 2d at 145).  Plaintiffs find themselves with

CIVIL 08-2335 (ADC)                        95

a sudden increase in rent and tariff, and what they feel is unreasonable, prejudicial and discriminatory conduct.  The Holland Group is attempting to secure what it considers a level playing field in making a losing enterprise a profitable venture, running the port like a business rather than like a subsidized government agency, such as the Puerto Rico Ports Authority.  I am not at all sure if a balance of the hardships tilts in favor of plaintiffs notwithstanding their very impressive showing during the hearing.  Again, the remedy sought is temporary although the provisional remedy would be in place during the administrative process.  During that time, the operator of the port would continue to subsidize plaintiffs in relation to utilities, and the comparable commercial rental value of the maritime operations facilities.  For example, plaintiffs paid a flat rate of $400 for electric utilities a month while consuming thousands of dollars in the same month.  Holland Group pays between $14,000 and $17,000 a month for electricity.  It notified plaintiffs that 30% of the bill would be charged to it, the estimate being that plaintiffs use about 80% of the electricity of the port.  The scales of equity tip heavily in favor of Holland Group in this regard.  *A fortiori*, the proper inquiry under former 46 U.S.C. § 816, section 17 of the Shipping Act, was whether the charge levied is reasonably related to the service rendered.  Volkswagenwerk Aktiengesellschaft v. Fed. Maritime Comm'n, 390 U.S. 261, 282 (1968).  There is no doubt that the increase, drastic as it is, is reasonably correlated to the

CIVIL 08-2335 (ADC)                    96

commercially-based cost.    Admittedly, there have been no alterations, improvements, modifications or additions to the port facilities.  At the same time, plaintiffs' containers and equipment can use the entire port during free time or pay for demurrage or storage after the sixth day.  See, e.g., California v. United States, 320 U.S. 577, 580-81 (1944).  The manner in which Holland Group may have negotiated or not negotiated the facially exorbitant adjustment may have less portent if one considers that Holland Group is understandably a for-profit corporation and that the port is no longer the beneficiary of a lethargic government largesse.  The same argument holds true for the adjustment of rent, the continuation of which, under tacita reconducción would have resulted in a non-profitable enterprises.

While plaintiffs have alleged million dollar losses and a collapse of their business, neither has materialized and appears unlikely to materialize. Notwithstanding Ms. Más' gloomy forecast,  neither is foreseen considering the evidence presented at the hearing.   Even if some of my numbers prove inaccurate, it is clear that Holland Group operates at a loss and it is not as clear that plaintiffs are operating in the same manner.   Indeed, if it pays over $1,000,000 in income tax, the loss becomes more difficult to envision.

CIVIL 08-2335 (ADC)                    97

(4) PUBLIC INTEREST

"[T]he logic of words should yield to the logic of realities."  Di Santo v. Commonwealth of Pennsylvania, 273 U.S. 34, 43 (1927) (Brandeis, J., dissenting).  It is tempting to announce that all of Puerto Rico is a depressed area but at very least it is clear from the evidence that the Mayagüez port sector is such an area.  The public interest is viewed through a large and small lens, the larger focused on making the port of Mayagüez profitable for the community of Mayagüez when compared to the profits of the parties.  This case reflects the concepts of free enterprise within a highly regulated framework.  The public interest is not best served by keeping what to an untrained eye may be considered subsidized, unrealistic tariff rates when Mayagüez would best be served by an efficiently run and developed port facility, which would include the Caribbean Express, as well as occasional or at least sporadic visiting cruise liners, and regardless of the waiting-to-be-assembled Russian Christopher Columbus statue beckoning them to port.  The public interest would not be served by ignoring the published tariff for the port of Mayagüez, a tariff that Holland Group is required to implement as port administrator.

Finally, without overstating the point, and conscious of the mediation proceedings scheduled before the Federal Maritime Commission beginning April 13, 2009, in Washington, D.C., the public interest does not favor injunctive

CIVIL 08-2335 (ADC)                          98

relief when parties are at loggerheads but amenable to negotiating in this ongoing relationship.  Considering the resources expended by the parties on this litigation so far, this controversy should be ended by successful alternative dispute, rather than by an acrimonious but civilized judicial process.  See, e.g., Me. Cent. R.R. Co. v. United Transp. Union, 787 F.2d 780, 781-82 (1st Cir. 1986).  However, the choice is, after all, theirs.

III.  CONCLUSION

Plaintiffs seek to enjoin the defendants from committing acts which violate the Shipping Act, and which are causing them irreparable injury.  They have stressed the injury to their credit, to their operation, to their present and future, including the closure of their operations at the port of Mayagüez by the only common carrier which operates at the port.  Nevertheless, "preliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances."  In re Premier Auto. Servs., Inc., 492 F.3d 274, 285 (4th Cir. 2007) (quoting MicroStrategy Inc. v. Motorola, Inc., 245 F.3d 335, 339 (4th Cir. 2001)).  Indeed, preliminary injunctions are considered a drastic remedy and the movant must clearly establish its burden.  See Texas v. Seatrain Int'l, S.A., 518 F.2d 175, 179 (5th Cir. 1975). The Shipping Act provides for such a remedy in such a limited circumstance. Nevertheless, plaintiffs have not shown that they are likely to prevail on the

CIVIL 08-2335 (ADC)                    99

merits based upon defendants' violations of the Shipping Act.  The ferry service does not a ferryboat make.  That non-maritime tenants might be charged a different rate for rental or utilities rate than the maritime-related user, or that the Puerto Rico Ports Authority tariff does not apply to the port of Mayagüez while it applies to other port operations in Puerto Rico does not create an unreasonable, invidious, unjust, discriminatory practice.  Traditionally,  complaints were brought by the small entrepreneur afraid of a Wal-mart driving them out of business based upon more-favored treatment for a larger enterprise.  Here the rental and higher rate for utilities would be logically higher considering the services required by Marine Express which are not, for example, required by Trofima or Bates, and the latter two of which do not present the port with the normal wear and tear of a common carrier.  While an 800% increase in charges shocks anyone, in the context of the evidence presented, and the reasoning espoused by Holland Group, such an increase and the manner the numbers were reached is not illogical and in fact complies with the terms of the published tariff from the Mayagüez Port Commission.  While the method, and abruptness of Holland Group, and the apparent lack of tact of Mr. González Freyre, may injure the sensibilities, the end result does not qualify as unjust, unreasonable and unlawful practices in violation of 46 U.S.C. § 41102(c).  The evidence does not squarely reflect that Holland Group is not willing to negotiate with plaintiffs, or that its correspondence clearly

CIVIL 08-2335 (ADC)                     100

reflects such a refusal.   (See, e.g., Exhibits 9, 19, 24, 32.)   Unreasonable discrimination is absent from any equation, unless one makes a rote comparison with the Puerto Rico Port Authority tariff, or unless one can find another tenant with which to make a viable comparison.  There is no evidence that Holland Group has subjected plaintiffs to unreasonable prejudice and disadvantages in violation of 46 U.S.C. § 41106(1)-(3).  Any prejudice to Marine Express that may be the result of the port operator's actions is the reasonable consequence of business decisions relying on a published tariff and professional judgment, myopic or expansive that it may be.  Plaintiffs are not being asked to finance the port of Mayagüez improvements and development but they are being pressed to realize commercial realities, realities which include the detachment of  the previous Puerto Rico Ports Authority tariff from the Mayagüez port regulatory scheme.

        Mr. Jacobs and Ms. Más, both obviously extremely articulate and intelligent witnesses, reasonably entrenched in their positions, have relied on the impressive documentation presented at the four-day hearing and arrived at different conclusions regarding negotiations and the reasonableness of terms.  The logic of words should yield.  Plaintiffs' success before the Federal Maritime Commission is possible but not highly likely.  Plaintiffs' injuries are accurately measurable with much difficulty under the circumstances, but are measurable.  There have been veiled and actual threats which if carried out could have disastrous consequences.

CIVIL 08-2335 (ADC)                    101

Those threats have failed to materialized during this stormy on-going relationship, and are unlikely to materialize again pending disposition of this action (although Ms. Más insists that the reason is the pending proceedings initiated by plaintiffs). However, there is no evidence of loss of traffic and the consequential loss of employment of plaintiffs' employees.  Nobody has lost his job.  Layoffs are not foreseen from the evidence presented.  Were the court to decide that somehow the injury is irreparable, or unmeasurable, the strength of likelihood of success would yet carry controlling weight.  The hardship factor does not clearly favor plaintiff, and the public interest would not be served by the interim remedy. Finally, any preliminary injunction issued by this court would be concluded upon termination of the proceedings before the Federal Maritime Commission, which has already announced a deadline-driven schedule for its resolution later this year.  See 46 U.S.C. § 41306(c).  The predictions of catastrophe by both parties, but particularly by plaintiffs, do not appear imminent, and while the business tempo at the port has forced plaintiffs to bend, they are not near the breaking point.

In view of the above, I recommend that the Motion for Preliminary Injunction filed by plaintiffs Western Holding Group, Inc., Marine Express, Inc. and Corporación Ferries del Caribe, Inc., on November 25, 2008 (Docket No. 2), against defendants Holland Group Port Investment (Mayagüez), Inc., José

CIVIL 08-2335 (ADC)                    102

González Freyre, and Antonio Jacobs, as administrators of the port of Mayagüez be DENIED.

Under the provisions of Rule 72(d), Local Rules, District of Puerto Rico, any party who objects to this report and recommendation must file a written objection thereto with the Clerk of this Court within ten (10) days of the party's receipt of this report and recommendation.  The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections.   Failure to comply with this rule precludes further appellate review.   See Thomas v. Arn, 474 U.S. 140, 155 (1985); Davet v. Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992); Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988); Borden v. Sec'y of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980).

At San Juan, Puerto Rico, this 17th day of April, 2009.

S/ JUSTO ARENAS
Chief United States Magistrate Judge